Per Curiam:
This case was referred to Trial Commissioner W. Ney Evans with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on September 30,1966. Exceptions to the commissioner’s findings and recommended conclusion of law were filed by the parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).
Commissioner Evans’ opinion,* as modified by the court, is as follows:
Plaintiff served in the Army as an enlisted man during World War I and as a commissioned officer during and after World War II. If he is entitled to the retirement pay which he seeks by this action, the computation would be made on *935 the basis of 75 percent of his active duty pay as of and from May 2, 1955, the date of his release from active duty by reason of disability.[1] It is my opinion that he is entitled so to recover.
In 1912, at age 17, plaintiff fell from a tree a distance of 30 feet and suffered a severe fracture of the right hip. A year or so later an open reduction was done which enabled him to resume normal activities, although his right leg was shortened, he had to wear a built-up shoe, and he walked with a limp.
In 1918, after rejection for volunteer service in the Army, the draft accepted him for limited service and he was inducted in August 1918 and served until his demobilization in January 1919.
Thereafter, in 1924, he underwent a second operation for correction of the fracture and was then able to withstand physical exertion, including walking for considerable distances, for 20 years or more.
Meanwhile, he studied law and worked for the General Accounting Office. By virtue of his training and experience he developed talents which were much in demand by the Army in 1942.
Beginning in June 1942, fiscal officers of the Army sought to obtain a commission for plaintiff. The medical officers, however, pronounced him unfit, even for limited service, because of his injury, and repeated the verdict three or four times. Ultimately, however, a waiver was obtained and plaintiff was commissioned, first in the Army Specialist Corps, in August 1942 and, upon the abolition of the Corps, in the Army of the United States in December 1942. He continued in service from December 1942 to May 2, 1955, when he was released from active duty because of physical disability.
*936 From August 1942 until early 1946, plaintiff was on duty at the Pentagon. As he was about to leave the military service and return to civilian life, the Army asked him and he agreed to undertake an assignment in the Ryukyu Islands to reorganize the fiscal and financial structure of those islands. He worked out of Okinawa from June 1946 through the year 1948 and then returned to duty at the Pentagon through 1949 and 1950. In April 1951 he undertook another assignment in the Orient and was on Formosa from May 1951 until October 14, 1954.
His duties in the Ryukyus began with the takeover by the Army from the Navy of the Military Government Headquarters, and extended from there over the entire 600-mile chain of islands. He traveled in small boats over choppy seas, made many trips into and over the various islands by jeep, and frequently had to walk inland a distance of 2 or 3 miles to confer with headmen. The roads were rough and so were the footpaths. The experience was not conducive to the favoring of his injured leg.
In 1947, while in Okinawa, he had a severe attack of pneumonia or influenza.
On his second tour of duty in the Orient, on Formosa, he found it necessary to share native food with the people with whom he worked, as a consequence of which he suffered intermittently from diarrhea.
On October 4, 1954, the Adjutant General advised the Chief of MAAG, Taipei, Formosa, that plaintiff would reach age 60 on December 29, 1954, and directed that final type physical examinations be accomplished immediately. Examinations were made at the MAAG Dispensary, the report of which was forwarded to Fort Meade, Maryland, where plaintiff arrived on or about November 15, 1954, having left Formosa on October 14. This report noted that the officer had been advised that available records indicated that he was not eligible for retirement.[2]
Further physical examinations were made at Fort Meade, where plaintiff applied for retirement because of age.[3] During the course of these examinations an appointment was *937 made for plaintiff at Walter Reed Hospital for orthopedic consultation, accompanied by a request for “evaluation as to question of possible service aggravation or whether he should appear before a Physical Evaluation Board because of his hip condition.”
The Consultation Report noted that “[t]his patient has a disability which he claims is service .aggravated and probably with good reason.” He was accordingly admitted to the hospital “for a work-up and presentation to the Physical Evaluation Board.”
The Report of Medical Examination at Walter Reed Hospital, dated 7 February 1955, found plaintiff not qualified for duty because of the following diagnosis:
Arthritis, severe, due to direct trauma, right hip joint, manifested by displacement of femoral head in ilium, posterior and superior, with marked incongruity of joint surfaces, 3y8" leg shortening, marked limitation of rotation of the thigh, moderate limitation of abduction, pain on ambulation, and marked right-sided limp, secondary to fracture-dislocation of the right hip incurred in 1912 when the patient fell from a tree in Oklahoma, and subsequent open reduction in 1914 in New Orleans and acetabuloplasty, approximately 1924, at a civilian hospital in Washington, D.C.
The Medical Board adopted the foregoing diagnosis and added to it the notation: “* * * unchanged. LOD: Yes, EPTS, aggravated by service.” The board made the following prognosis:
This patient may get along for a fair amount of time with minimal discomfort as at present; however, in view of the arthritic changes he may have progression of pain and limitation of motion.
The foregoing prognosis was followed by the recommendation :
It is the opinion of the Medical Board that the patient has received maximum benefits of hospitalization and is not fit for military duty. It is clear that his condition existed prior to military service; that all treatment was carried out while not in the military service, and that there is no evidence of any specific episode of trauma which could be considered to have aggravated his degenerative (traumatic) arthritis. The present worsening *938 of bis condition, evidenced by progression of pain and limitation of motion, is considered to be tbe natural progression of this disease, but bas occurred while in the military service and could on this basis only be considered service aggravated.
The sense of the Medical Board’s diagnosis, prognosis, and recommendation, to a nonmedical reviewer, is that plaintiff was, at the time of examination, suffering from severe arthritis ; that the arthritis was due to the direct trauma of his hip injury; that while he might “get along for a fair amount of time with minimal discomfort as at present,” the arthritic condition was such that he might have “progression of pain and limitation of motion”; that there was “no evidence of any specific episode of trauma which could be considered to have aggravated his degenerative (traumatic) arthritis”; that “the present worsening of his condition, evidenced by progression of pain and limitation of motion, is considered to be the natural progression of this disease”; but that it (the present worsening of his condition, evidenced 'by progression of pain and limitation of motion), “has occurred while in the military service and could on this basis only be considered service aggravated.”
The report of the Medical Board, including the clinical abstract attached thereto, contains the only detailed medical evidence in the record on the arthritic condition. All subsequent findings by administrative boards were predicated on that report.
Implicit in the board’s conclusion that the “present worsening” of plaintiff’s condition “has occurred while in the military service” is the finding that the arthritis existed prior to plaintiff’s term of service. This implication, in turn, supports the further finding that the worsening of the condition “is considered to be” the natural progression of the disease.
The task of the present reviewer is made more difficult by the further facts that the evidence of record clearly warrants the findings that arthritis, as distinguished from the hip fracture, was unknown to plaintiff at the time he entered service in 1942 and was not noted in his medical history until 1951. Even so, in view of the Medical Board’s finding, the point must be deemed a matter of medical opinion and judgment *939 and, in the absence of countervailing medical evidence, there is no foundation for a conclusion that the Medical Board’s finding was not supported by substantial evidence.
The Medical Board’s finding that there was “no evidence of any specific episode of trauma which could be considered to have aggravated his degenerative (traumatic) arthritis” negates plaintiff’s contention that the 1947 attack of pneumonia (influenza) constituted “an abrupt and sudden pathological development” within the meaning of Army Regulation 600-140. Here again, in the absence of countervailing medical testimony, there is no foundation for a conclusion that the Medical Board’s finding was not supported by substantial evidence.
The report of the Medical Board was referred to a Physical Evaluation Board before which plaintiff appeared on 14 February 1955. This board recommended the finding that—
* * * The individual is physically unfit to perform the duties of his officej rank, or grade by reason of physical disability * * * incurred while entitled to receive basic pay as a * * * member of reserve component on extended active duty.
The disability, rated as “severe” and related to the Veterans Administration Diagnostic Code Numbers 5010-5255, was described as follows:
Arthritis, severe, due to direct trauma, right hip joint, manifested by displacement of femoral head in ilium, posterior and superior, with marked incongruity of joint surfaces, 3%" leg shortening, marked limitation of rotation of the thigh, moderate limitation of abduction, pain on ambulation, and marked right-sided limp, secondary to fracture-dislocation of the right hip incurred in 1912, and acetabuloplasty, approximately 1924. Unchanged, with recurrence of symptoms of pain in right hip — in 1947.'
The Physical Evaluation Board recommended further findings (1) that the approximate date of origin or inception was EPTS; (2) that the disability was permanently aggravated by military duty; (3) that it was incurred in line of duty by aggravation; (4) that it was permanent; (5) that the unfitness was 30 percent disabling in accordance with the rating schedules of the Veterans Administration; and (6) *940 that the individual became physically unfit on 22 December 1954.
On 11 March 1955, the Physical Review Council, with plaintiff’s 201 file and all clinical records before it, rejected the Physical Evaluation Board’s findings that the disability was incurred while plaintiff was entitled to receive basic pay; that the disability was permanently aggravated by military service and incurred in line of duty by aggravation; and that the unfitness was 30 percent disabling. In lieu of these rejected findings, the Physical Review Council found that the disability existed prior to service and was not ratable. By way of “Remarks” the Physical Review Council added:
The evidence of record is considered sufficient to establish the inception of the member’s disability, arthritis, right hip joint with limitation of motion and three and one-half inches shortening of leg, as having been prior to military service. There is no convincing evidence of permanent aggravation by military service. Therefore, the member’s disability is considered to be Line of Duty, No- — EPTS, not aggravated and not ratable.
On 22 April 1955, the Physical Disability Appeal Board, with all prior proceedings and plaintiff’s rebuttal before it, concurred “in the findings of the Army Physical Review Council * * *” and recommended that plaintiff “be separated from the service because of physical disability (EPTS).”
Plaintiff was released from active duty accordingly on 2 May 1955.
On 9 December 1955, plaintiff appeared (with private counsel) before a Disability Review Board. Testimony was presented and arguments were made. This board entered detailed findings, all in conformity with the findings of the Physical Review Council, and adopted verbatim the conclusion stated by the Physical Review Council in its “Remarks,” quoted above.
On 22 August 1957, the Adjutant General notified plaintiff of the determination by the Board for Correction of Military Records, to which plaintiff had applied, that “insufficient evidence has been presented to indicate probable material *941 error or injustice,” wherefore plaintiff’s application was denied by the board.
Summarizing the foregoing administrative proceedings, the Physical Evaluation Board recommended findings of disability incurred in line of duty by aggravation (although EPTS), severe in nature, and warranting a rating of 30 percent under the Veterans Administration schedules. The Physical Review Council rejected these findings, noting that the inception of the disability was prior to service, and further that “[tjhere is no convincing evidence of permanent aggravation by military service.” Two other boards, the Physical Disability Appeal Board and the Physical Disability Review Board, concurred in the findings and conclusions of the Physical Review Council.
As heretofore noted, the record in this case does not contain appropriate foundations for the rejection of board findings for lack of support by substantial evidence. The finding (by implication) that the arthritis as well as the hip fracture existed prior to service must therefore stand, as does the further finding that there was no evidence of any specific episode of trauma which could be considered to have aggravated the arthritis. The same is true of the Medical Board’s finding that the worsening of the condition reflects the natural progression of the disease and of the Physical Review Council’s finding that there is no convincing evidence of permanent aggravation by military service.
The following modifications of the foregoing acceptance of the findings must be noted. The Medical Board qualified its finding that the worsening of the condition reflected the natural progression of the disease by saying that since the worsening of the condition occurred during military service, it “could on this basis only be considered service aggravated.” The Physical Evaluation Board did so find. The Physical Review Council, however, in rejecting the finding by the Physical Evaluation Board, made no mention of the natural progression of the disease. It asserted only that the evidence of record is considered sufficient to establish the member’s disability as having been prior to military service, and then observed that “there is no convincing evidence of permanent aggravation by military service.”
*942 On tbis basis there remains for discussion the question as to whether the Physical Review Council failed to give adequate scope as a matter of law to the applicable Army regulations. If the conclusion of the Council, denying plaintiff a disability rating for lack of convincing evidence of permanent aggravation by military service, violated plaintiff’s rights under the applicable regulations, its action would have to be deemed invalid in law, and such invalidity would infect the adoption of the Council’s action by the Physical Disability Appeal Board, the Physical Disability Review Board, the Secretary of the Army, and the Board for Correction of Military Records. Such an outcome would leave the findings of the Physical Evaluation Board as the controlling administrative decision.
Reduced to its simplest terms this question relates to the burden of proof (or the burden of going forward, as you will). Was it incumbent on plaintiff, under the regulations, to adduce convincing evidence of permanent aggravation by military service, or was it incumbent upon the Army, instead, to adduce evidence of nonaggravation?
The applicable Army regulations are set forth in finding 12. They consist of a series of presumptions favoring the serviceman and of requirements upon administrative channels in applying and rebutting those presumptions.
At the outset the board is directed by the regulations to make recommended findings as to whether the disability, or aggravation thereof, was incurred while the member was entitled to receive basic pay. In determining whether the disability of a member was incurred prior to entrance into service and, if so, whether it was aggravated thereby, the principles set out in AR 600-140 will be followed.
The first presumption in AR 600-140 is that disease incurred by a member while on active duty will be presumed to have been incurred in line of duty and not because of the member’s own misconduct. The presumption favoring line of duty may be overcome only by substantial evidence that the disease was contracted while not on active duty and was not aggravated by the service.
The Medical Board specifically found that the worsening of plaintiff’s condition “has occurred in the military service.” *943 The Physical Evaluation Board found that plaintiff was unfit by reason of physical disability “incurred while entitled to receive basic pay as a * * * member of reserve component on extended active duty.” No specific evidence was offered at any of the administrative proceedings that the disability (arthritis) was incurred while not on active duty [4] or was not aggravated by the service.[5]
A second presumption states that a member will be presumed to have been in sound physical condition upon entering active service. In order to overcome this presumption, it must be shown by substantial evidence that the injury or disease was sustained or contracted while the individual was not on active duty. Even if the initial presumption is overcome by such evidence, it is further presumed that any additional disability resulting from the preexisting injury or disease was caused by service aggravation thereof. Only specific findings of “natural progress” of the preexisting injury or disease, based upon well-established medical principles, as distinguished from medical judgment alone, are sufficient to overcome the presumption of service aggravation.
If one pauses in the analysis at this point, plaintiff would appear superficially to have a strong case based upon the presumption that any additional disability resulting from the preexisting injury or disease was caused by service aggravation thereof. No specific findings of “natural progress” of the preexisting injury or disease, based upon well-established medical principles as distinguished from medical judgment alone, were entered by the Physical Review Council.
On the facts of this case, the presumption of sound physical condition upon entering active service immediately raises the question of the effect thereon, and of the place in this discussion in general, of the waivers executed by plaintiff in relation to his hip fracture.
As noted in finding 2 (b) plaintiff signed a waiver whereby he acknowledged his awareness of the fact that he had the *944 physical defect described as fracture, old, neck of femur and acetabulum, right, with chronic dislocation, et cetera. As further noted in finding 15 (b), there is no evidence of what, if anything, the Army waived in connection with the injury; but the Army did authorize the waiver.
The rationale of the waiver procedure is that plaintiff, as a potential serviceman, acknowledged in writing the existence of a specific physical defect which would under normal Army requirements, disqualify him from entering the service; and that the Army, in recognition of his acknowledgment, accepted him for service in spite of the defect. In so doing, the Army waived a portion of its requirement of sound, unimpaired physical condition. As a consequence of the waiver signed by him, the serviceman would be precluded from ever asserting a claim of disability based upon the specific defect as it existed at the time of the waiver. On the other hand, the wording of the presumption that any additional disability resulting from the preexisting injury was caused by service aggravation precludes the Army from extending the waiver ipso facto to any and all increases of disability centering in the region of the original defect.
Therefore, plaintiff would appear to be entitled to the benefit of the presumption of sound condition, subject only to the waiver of the fracture defect as described in his acknowledgment. He would likewise be entitled to the presumption of service aggravation in the absence of specific findings of “natural progress” based upon well-established medical principles, as distinguished from medical judgment alone, subject, however, to the additional conditions stated in the regulations.
Following is the text of the conditions set forth in the regulations relating to the presumption of service aggravation:
* * * Service aggravated condition. — Any increase in disability during active service resulting from a condition that existed prior to the active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the basis of well established medical principles. Medical or surgical treatment furnished during service for preexisting conditions does not of itself establish service aggravation. Mere recurrences of certain diseases within a short period after the patient’s *945 entrance into active service such, as epileptic seizures, seasonal asthma, recurrent dislocations, etc., do not establish service aggravation. Also, incapacitating defects due to certain diseases, such as neoplasms, most endocrine disturbances, epilepsy, arteriosclerosis, and arthritis, and other chronic and degenerative diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of preexisting conditions, and not be incident to or aggravated by service. * * *
It does not appear from the evidence that any medical or surgical treatment was furnished to plaintiff during service for the preexisting conditions of either the hip fracture or the arthritis except on one occasion in 1951 when he was given a prescription for arthritic pain. This minor recognition of preexisting conditions is insufficient to establish service aggravation and may therefore be disregarded. The reference to recurrence of disease “within a short period of time after the patient’s entrance into active service” is likewise of no significance.
Passing to the last sentence in the excerpt above quoted, the findings of the Medical Board negate the occurrence of “some pertinent local injury, or an abrupt and sudden pathological development during active service.”
Elimination of the passages above noted reduces the pertinent portions of the conditions to the following:
* * * Any increase in disability during active service resulting from a condition that existed prior to the active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the basis of well established medical principles. * * * [I]ncapac-itating defects due to certain diseases, such as * * * arthritis * * * in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. * * * [S]uch incapacitating defects may arise as a natural consequence of preexisting conditions, and not be incident to or aggravated by service.
The fact is undisputed throughout the record that plaintiff was unfit for further duty in and after December 1954 and *946 that his unfitness was the result of an increase in disability resulting from a condition that existed prior to his active service. The clear language of the regulation is that such increase will be presumed to have been service aggravated unless it can be proved otherwise on the basis of well-established medical principles. “Unless it can be proved” by whom? The sense of the regulation is “unless it can be proved” by the Army. The additional words, “on the basis of well established medical principles” clearly refer to the distinction between well-established medical principles and medical judgment.
The further provisions relating to the incapacitating defects of arthritis are likewise related to the burden of proof. Such incapacitating defects are not of themselves evidence of increased disability, but may arise as a natural consequence of preexisting conditions and not be incidental to or aggravated by service.
In other words, the presumption of service aggravation can be overcome on the basis of well-established medical principles, as a part of which the incapacitating defects of arthritis may be disregarded as evidence in and of themselves of increased disability if they be found to have arisen as a natural consequence of preexisting conditions and not incidental to or otherwise aggravated by service.
Presumably, defendant would have this court say that this is precisely what the Physical Review Council meant: that plaintiff was disabled by the incapacitating defects of arthritis ; that such defects are not evidence of increased disability since they arose as a natural consequence of preexisting conditions ; wherefore they were not incidental to or otherwise aggravated by service.
This is what the Physical Review Council may possibly have meant: but this is not what it said. It said only that “there is no convincing evidence of permanent aggravation by military service.” It made no reference to “specific findings of ‘natural progress’ of the preexisting injury or disease,” nor to “well established medical principles, as distinguished from medical judgment alone.” And the regulations provide in so many words that only such spe *947 cific findings “are sufficient to overcome the presumption of service aggravation.”
Will the counter argument stand that the distinction between what the Council meant and what it said is only a lawyer’s refinement?
Consider the effect upon plaintiff of alternative expressions by the Council, one representing what it said, the other representing a hypothetical compliance in detail with the requirements of the regulations.
Plaintiff, confronted as he was by the Physical Review Council’s conclusion that there was no convincing evidence of permanent aggravation by military service, went before the Physical Disability Appeal Board, and later the Physical Disability Review Board, in an effort to bolster the proof of service aggravation and thus to restore the finding by the Physical Evaluation Board. In his appearance before the Review Board, he undertook to establish “an abrupt and sudden pathological development during active service,” in an obvious attempt to overcome the limitations placed by the regulations upon the incapacitating defects of arthritis.
Next, let it be supposed that the Physical Review Council, instead of pointing to the lack of convincing evidence of permanent aggravation by military service, had “tracked the statute,” so to speak, in following the regulations. In so doing, the Council would have made specific findings of natural progress of the preexisting injury or disease and would have based those findings upon well-established medical principles as distinguished from medical judgment alone.
If plaintiff had gone to the Physical Disability Appeal Board (and later to the Physical Disability Review Board) for review of a decision by the Physical Review Council containing the specific findings mentioned in the preceding paragraph, his task before the reviewing boards would have been, not to prove service aggravation, for that was presumed, but to show that the conclusions of the Physical Review Council were not necessarily based upon well-established medical principles but reflected instead only medical judgment.
The difference between the two undertakings of proof is crucial to the preservation of plaintiff’s rights under *948 the regulations. Doctors, it is believed, find it as difficult to agree upon the line between well-established medical principles and medical judgment alone as do lawyers in drawing the line between findings of fact and conclusions of law. Moreover, and more significantly, plaintiff’s effort to prove service aggravation was handicapped by his inability to assemble pertinent medical records compiled during his stay in the Orient. If the burden had been on the Army to rebut the presumption of service aggravation, the paucity of medical records would have been more of a handicap to the Army than to plaintiff. Some such consideration as this may have engendered the presumptions in the regulations.
Plaintiff has been deprived of substantial rights under the regulations by the effect of the Physical Review Council’s decision in placing upon him the burden of proving service aggravation. On the present record, he can stand upon the presumption in the regulations that his disability was service aggravated. He is therefore entitled to recover.
FINDINGS on Fact
1. (a) Plaintiff was 17 years of age in 1912[1] when he sustained a severe fracture of the right hip in a 30-foot fall. Two years later, in 1914, an open reduction was performed, whereby his condition was much improved.
(b) During World War I plaintiff tried four times to enlist in the Army but was turned down because of his injury. Upon acceptance by the draft, however, he was inducted into the Army for limited service on August 27, 1918, and served until January 9,1919, when he was honorably discharged in the course of demobilization.[2]
(c) In 1924, an acetabuloplasty was performed.[3] Thereafter, following a period of recuperation and a regimen of controlled exercises, his muscles were strengthened to the point that he was able for 20 years or more to engage in *949 normal pursuits, including walking over considerable distances.[4]
(d) During the time between the wars plaintiff studied law and was employed by the General Accounting Office. As a result of his training and experience he acquired talents which were much in demand by the Army during World War II.
2. (a) On June 1, 1942, the Administrative Assistant to the Director, Fiscal Division, United States Army, requested Walter Reed Hospital to give plaintiff “a final type physical examination with a view toward a commission in the Army of the United States.” The examination was made and on June 8 the report was given that plaintiff was physically disqualified and waiver was not recommended. The “disqualifying defect” was described as “fracture, old, neck of femur and acetabulum, right, with chronic dislocation of head of femur from acetabulum, nails in situ and apparent shortening of leg by 3 inches.”[5]
*950 (b) The Fiscal Division decided to request a waiver, nevertheless, whereupon at its suggestion plaintiff signed the following “Waiver of Physical Defects”:
* * * I, William E. Eeese, being desirous of entering upon active military service during the current emergency, being aware of the fact that I have the following physical defects: Fracture, old, neck of femur and ace-tabulum, right, with chronic dislocation of head of femur from acetabulum, nails in situ and apparent shortening of leg by 3 inches * * * do hereby acknowledge the existence of the above mentioned physical defects, and request that I be placed on extended active duty.
(c) The request for waiver was transmitted to the Adjutant General through the Director of Military Personnel and was ultimately referred to the Surgeon General who reported plaintiff “physically disqualified * * * waiver not recommended for limited service.”
(d) The Fiscal Division then put in a requisition request for plaintiff to serve with the Army Specialist Corps. Once again, the Surgeon General reported to the Adjutant General that plaintiff was “physically disqualified for appointment in the Army Specialist Corps * * * waiver * * * not recommended.” Within a week or 10 days, however, the Surgeon General reconsidered and recommended waiver for appointment in the Army Specialist Corps. Plaintiff again signed a waiver, was appointed major, executed the oath of office on August 25, 1942, and entered on duty. Plaintiff was then 47 years old.
(e) Three months later, the Army Specialist Corps having proved to be “neither fish nor fowl,” decision was made to abolish it. Efforts were then renewed to obtain a commission for plaintiff in the Army of the United States. On November 18, 1942, the Surgeon General advised the Adjutant General that plaintiff was “physically disqualified for appointment in the A.U.S. * * * [and] not physically qualified for limited service.” On November 30, 1942, plaintiff signed a third waiver, and on December 16, 1942, was appointed major, Army of the United States. He accepted *951 the appointment the next day and continued in service at the Pentagon until some time in 1946.[6]
3. (a) Early in 1946, as plaintiff was planning to leave military service and return to civilian life, he was requested by the Army to accept an assignment in the Ryukyu Islands (of which Okinawa and Formosa are a part) to reorganize the fiscal and financial structure of those islands. He arrived in Okinawa in May or early June 1946, to assist in the take-over by the Army from the Navy of the Military Government Headquarters. He remained on duty in that area until the end of the year 1948. Returning to the United States in early January 1949, he was on duty at the Pentagon until April 1951, when he again went to the Orient for a second tour of duty, arriving in Formosa on May 14, 1951, where he served as Controller of the Mission’s Planned Assistance Advisory Group until October 14, 1954.
(b) In the course of his duties in the Ryukyus, plaintiff traveled extensively up and down the 600-mile chain of islands by boat, made many excursions into and over the various islands by jeep, and often had to walk a distance of 1, 2, or 3 miles inland to confer with headmen. The seas were choppy, the roads were rough, and the footpaths craggy.
(c) During his 3-year tour of duty in Formosa, plaintiff likewise had to travel, although not as extensively as from Okinawa. His major problem in Formosa was his inability to avoid eating native food, as a consequence of which he suffered intermittently from diarrhea.
(d) On one occasion in Manila, in 1946, and on another at the Pentagon in 1949, plaintiff sustained hard falls, each of which resulted in sprain of the right ankle.
*952 (e) In Okinawa, in 1947, plaintiff was hospitalized for several days with a respiratory infection variously diagnosed as pneumonia, influenza, and encephalitis. It was a serious illness. When his condition had sufficiently improved, he was sent to a recuperation center in the southern Ryukyus. While there, he went for a walk on the beach and, as he testified:
* * * I walked a little distance down the beach and I noticed after walking a bit, there appeared to be a slight movement in the right hip joint, and pretty soon I began to get very tired in that j oint. I stopped and rested, and decided I better go back. I probably had to rest at least a half dozen times on the way back.
Plaintiff has insisted throughout the record in this case (1) that he never had pain in his right hip until this episode and (2) that he has never been free of such pain, even upon slight exertion, since then.
(f) Plaintiff was admitted to or treated by hospitals on Formosa in 1951,1952,1953, and 1954, for complaints of fever and chills, weakness, malaise, abdominal distress, and diarrhea. On one chart, dated 17 November 1951, it is noted that he “appears to have sv pain in rt. hip.” This notation is followed by “APC for arthritic pains in hip.” The significance of the notation is that it is the first reference in the record to arthritis. Also, on Formosa, in 1954, plaintiff had a serious mishap during the course of a tooth extraction when the antrum was punctured.
(g) Otherwise, routine physical examinations of plaintiff performed in the field in 1947,1948,1952,1953, and 1954 pronounced him “physically capable of performing duties commensurate with his rank and experience in his present or basic branch of service.”
4. (a) On October 4, 1954, the Adjutant General advised the Chief of MAAG, Taipei, Formosa, where plaintiff was serving as Finance Officer, that plaintiff would reach age 60 on December 29,1954; and that final type physical examinations were to be accomplished immediately.
(b) Examinations were made at the MAAG Dispensary Station, Formosa, on October 6, 1954. Notations were entered as to “sinus drainage,” “sinusitis right maxillary, result of fistula from tooth socket, now healed,” “systolic murmur” *953 [of the heart], “some varicosities — lower extremities,” “arthritis, right foot,” and “marked limp — 1 % to 2 inches-shortening right lower extremities, result of old fracture right hip.”
(c) Plaintiff left Formosa on October 14,1954, and arrived at Fort George Meade, Maryland, on or about November 15, 1954. That station had been requested to make a final type physical examination and to retain the officer “on AD * * * pending further instr * * An “Info Note” appended to the request stated “Off advised avail records indicate he is not elig. for ret.”
(d) Further physical examinations were made at Fort Meade on November 26 and 27,1954. Whereas in answer to questions during the examination on Formosa, on October 4, 1954, plaintiff had said that he was “apparently all right,” and had listed as having (or having had) “ear, nose, or throat trouble,” “malaria,” “chronic cough only Formosa,” “high blood pressure,” “lameness,” and “foot trouble,” his answers at Fort Meade omitted the “apparently all right” and added to the foregoing list “swollen or painful joints,” “chronic or frequent colds,” “severe tooth or gum trouble,” “sinusitis,” “shortness of breath,” “pain or pressure in chest,” “palpitation or pounding heart,” “cramps in * * * legs,” “stomach, liver, or intestinal trouble,” “tumor growth * * *,” “frequent or painful urination,” “recent gain or loss of weight,” “arthritis or rheumatism,” “painful or ‘trick’ shoulder or elbow,” “frequent or terrifying nightmares,” “depression or excessive worry,” and “loss of memory.”
(e) The Chief of Medicine at Fort Meade inserted in his Report of (plaintiff’s) Medical History the following statement:
This officer is applying for retirement because of age. 10 yrs. ago had trouble with his rt. shoulder with aching but at present time has no joint trouble. Pt. fractured his rt. hip prior to military service. He was rejected from Service 'because of shortening of rt. leg of 2-2y2 in. as residual of the fracture and an operation to make a new hip joint. Entered service with a waiver because of hip injury.
In the spring of 1954 he had a tooth extracted and an opening into the right maxillary sinus developed plus a sinusitis. He was 'hospitalized at Okinawa and treated for this with complete cure. While on Formosa he had *954 frequent colds. Gives a history of having had pneumonia in 1947 and was hospitalized in Okinawa base hospital for 35 days.
Prior to entering active duty during W.W.II he received treatment for high blood pressure.
While in Formosa he noted from time to time a palpitation or fluttering of his heart. He blames the tension he was under as the probable cause of this.
liad soaking night sweats only during childhood.
While on Formosa in 1951 he developed a severe diarrhea and received treatment thought to be due to amoe-biasis. At present time has occasional diarrheal stools and a lot ox gas. Has passed no blood. He gained 14 lbs. while on Formosa in 1953.
While on Okinawa in 1947 he was given a drug for a cold and he developed severe abdominal pain. (Can’t remember what the drug was.)
Has a cyst on his right groin.
In June 1954 while in hospital for sinusitis he developed an inability to pass his urine. However, at present time he has noctumia l-2x. [sic]
States he has had frequent nightmares, worry and has noted a decrease in memory during the past 2-3 years.
(f) The same physician, in his Report of Medical Examination, noted abnormalities only as to the vascular system, lower extremities, and (operative) scars, described the deformity of the right hip, and concluded that plaintiff was “qualified for duty with waiver for right hip.” He further noted that “this officer has an orthopedic consultation appointment 'at Walter Reed Hospital on 22 Dec 54 regards right hip.”
5. (a) The Clinical Record and Consultation Sheet forwarded to the Orthopedic Service at Walter Reed Army Hospital contained the following request (dated 2 December 1954) and consultation report:
Request
This Colonel is up for separation because of age. He gives a history of fracturing his right hip in 1912. He was rejected four times while volunteering for service 'but was finally drafted. He was separated from the service and had further operation on his hip following this. He again served in World War II.
*955 Request evaluation as to question of possible Service aggravation or whether he should appear before a Physical Evaluation Board because of his hip condition.
Consultation Report
This patient is referred for evaluation of an old hip in j ury prior to separation from the service. This patient sustained an EPTS fracture of the right hip in 1912 for which he was given an open reduction by a civilian surgeon in Washington, D. C. He was subsequently drafted in World War I and served both in World War I and later on in World War II. This patient has a disability which he claims is service aggravated and probably with good reason. He is, therefore, being admitted to the hospital for a work-up and presentation to the Physical Evaluation Board.
A further request was made for X-rays to accompany the patient.
(b) The Report of Medical Examination at Walter Reed, dated Y February 1955, listed abnormalities only as to feet, lower extremities, and surgical scars, but found plaintiff not qualified for duty, because of the following diagnosis:
Arthritis, severe, due to direct trauma, right hip joint, manifested by displacement of femoral head in ilium, posterior and superior, with marked incongruity of joint surfaces, 3leg shortening, marked limitation of rotation of the thigh, moderate limitation of abduction, pain on ambulation, and marked right-sided limp, secondary to fracture-dislocation of the right hip incurred in 1912 when the patient fell from a tree in Oklahoma, and subsequent open reduction in 1914 in New Orleans and acetabuloplasty, approximately 1924, at a civilian hospital in Washington, D.C.
(c) On the same date (Y February 1955), the Medical Board adopted the foregoing diagnosis, to which it added: “* * * unchanged. LOD: Yes, EPTS, aggravated by service.” Appended to the Medical Board Proceedings was a “brief clinical abstract” (of 2y2 single-spaced typed pages) from which the following are excerpts:
* * * X-ray of the right hip disclosed evidence of the old fracture involving the right femoral head with displacement of the arthritic femoral head superior and *956 posterior in the iliac fossa, and there were three metallic nails transfixing the greater trochanter to the femur. The acetabulum on the right was obliterated. * * *
* * * X-rays revealed a badly deformed atrophic head of the right femur which has been displaced upward and posteriorly along the ilium, the result of previous acetabuloplasty. * * *
The Medical Board made the following prognosis:
This patient may get along for a fair amount of time with minimal discomfort as at present; however, in view of the arthritic changes he may have progression of pain and limitation of motion.
The following recommendation followed the prognosis:
It is the opinion of the Medical Board that the patient has received maximum benefits of hospitalization and is not fit for military duty. It is clear that his condition existed prior to military service; that all treatment was carried out while not in the military service, and that there is no evidence of any specific episode of trauma which could be considered to have aggravated his degenerative (traumatic) arthritis. The present worsening of his condition, evidenced by progression of pain and limitation of motion, is considered to be the natural progression of this disease, but has occurred while in the military service and could on this basis only be considered service aggravated.
(d) The case was accordingly referred to a Physical Evaluation Board. Plaintiff was advised of the reference and elected to appear in person and to be represented “by the regularly appointed counsel at no expense to” him.
6. (a) The Physical Evaluation Board convened on 14 February 1955. Plaintiff was present, and counsel was duly assigned to him. Plaintiff testified and his counsel argued that the 1947 bout with pneumonia (influenza) constituted “an abrupt and sudden pathological development.” [7] Counsel further argued:
* * * Certainly, if ever there was a case where it could not be said beyond doubt that there was no aggravation, this case is it. There is all the doubt in the world in this case that it was natural progress. There are many things in it that would raise such doubt and *957 indicate that it was not natural progress but was aggravated by service, and that doubt, as all other doubts in this type of case, should be resolved in favor of the patient.
(b) The Physical Evaluation Board recommended the finding that—
* * * The individual is physically unfit to perform the duties of his office? rank, or grade by reason of physical disability * * * incurred while entitled to receive basic pay as a * * * member of reserve component on extended active duty.
The disability, rated as severe and related to the Veterans Administration Diagnostic Code Numbers 5010-5255, was described as follows:
Arthritis, severe, due to direct trauma, right hip. joint, manifested by displacement of femoral head in ilium, posterior and superior, with marked incongruity of joint surfaces, 3y8'' leg shortening, marked limitation of rotation of the thigh, moderate limitation of abduction, pain on ambulation, and marked right-sided limp, secondary to fracture-dislocation of the right hip incurred in 1912, and acetabuloplasty, approximately 1924. Unchanged, with recurrence of symptoms of pain in right hip — in 1947.
(c) Following are further excerpts from the Proceedings of Physical Evaluation Board:
14. b. [x] The individual is physically unfit to perform the duties of his office, rank, or grade by reason of physical disability (1) 0 incurred while entitled to receive basic pay as a * * * [xj member of reserve component on extended active duty.
❖ # * # ij:
16. Approximate date of origin or inception E.P.T.S.
17. Incurred in time of war or national emergency No.
18. Result of intentional misconduct or willful neglect No.
19. Incurred during a period of unauthorized absence No.
20. The proximate result of the performance of duty No.
21. Permanently aggravated by military duty Yes.
22. Incurred in line of duty Yes (by aggravation).
23. Incurred in combat with enemy of the United States No.
*958 24. Besult from explosion of instrumentality of war in line of duty No.
25. Permanent a. Is 1. Yes
26. Percentage of disability a. At time of evaluation 1. 30. b. Upon entry in service or non-service connected 1. 0. c. Net 1. 30. Combined rating 30.
27. Such unfitness * * * |x] is not the result of 0 intentional misconduct (or) [x] willful neglect and * * * 0 was not incurred during a period of unauthorized absence.
28. Such unfitness is 30 percentum disabling, in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration.
29. Such unfitness [x] is permanent * * *.
30. Such unfitness * * * [x] is not the proximate result of the individual’s performance of active duty.
31. The individual became physically unfit to perform the duties of his office, rank or grade on 22 Dec 1954 * * *.
7. (a) On 25 February 1955, the Army Physical Beview Council transmitted a Disposition Form request for the AG 201 file and all clinical records, current and of prior service with the Armed Forces. These documents were forwarded to the Physical Beview Council on 9 March 1955.
(b) On 11 March 1955, the Physical Beview Council noted the following modified findings:
Items 14b Í1) : Delete checks.
14b (3): Check “which existed prior to service.”
21 and 22: Change to “No.”
26 and 28: Delete entries.
31: Delete date and check “EPTS.”
Bemarks
The evidence of record is considered sufficient to establish the inception of the member’s disability, arthritis, right hip joint with limitation of motion and three and one-half inches shortening of leg, as having been prior to military service. There is no convincing evidence of permanent aggravation by military service. Therefore, the member’s disability is considered to be Line of Duty, No — EPTS, not aggravated and not ratable.
(c) On 11 March 1955, the Adjutant General notified plaintiff in writing of the action of the Physical Beview Council and said:
*959 Prior to final action being taken in your case, if you desire to render a rebuttal based upon the above, such written statement must be prepared and returned within seven (7) days after receipt of this communication. If you do not desire to exercise the right of rebuttal a statement must be made to that effect by indorsement hereon. If written statement is not received by the date indicated opposite “S” above, final action will be taken by the Secretary of the Army on the physical evaluation board proceedings as modified. Statement may be forwarded direct to The Adjutant General, Attn: AGPO-B5, Washington 25, D.C., with an information copy to the Commanding General of the above hospital. A self-addressed envelope requiring no postage is inclosed for your convenience.
Upon receipt of your rebuttal, both the recommended findings of your physical evaluation board at Walter Reed Army Hospital and the recommended modified findings of the Army Physical Review Council will be considered by the Army Physical Disability Appeal Board. This board is established for the purpose of reviewing cases of a controversial nature to insure that no individual is separated or retired from the Army for physical disability without having received a full and fair hearing. The Appeal Board is composed of General Officers, technically advised by Medical Officers. They consider the same evidence and records, but hi addition consider your rebuttal to the Review Council’s findings. The adjudication of the differences in the recommended findings is made in the name of the Secretary of the Army and is final.
(d) On April 12,1955, plaintiff submitted to the Adjutant General an extensive statement in rebuttal (in which he was joined by private counsel), the essence of which was that when plaintiff entered the service in 1942 there was no evidence of any arthritic changes. This statement, together with the Proceedings before the Physical Evaluation Board, the Physical Review Council, the AG 201 file, and certain X-ray films were forwarded to the Army Physical Disability Appeal Board on 20 April 1955.
(e) On 22 April 1955, the Physical Disability Appeal Board notified the Adjutant General that—
The Board concurs in the findings of the Army Physical Review Council * * * and recommends that [plain *960 tiff] be separated from the service because of physical disability (EPTS).
8. (a) On 25 April 1955, the Adjutant General, acting for the Secretary of the Army, advised the Commanding General of Walter Reed Army Medical Center of the board actions and requested “that orders be issued relieving officer from active duty by reason of physical disability * * adding:
Although subject officer is not eligible to receive disability severance pay, he may be entitled to disability compensation on a percentage basis from the Veterans Administration under laws administered by that agency. If he has not already done so, it is suggested that he be advised to contact the Veterans Administration facility nearest his home for further information in this respect.
It is requested that a copy of this letter be furnished subject officer.
(b) On 2 May 1955, plaintiff was released from active duty accordingly.
9. On June 30,1955, plaintiff was given a rating examination by the Veterans Administration the result of which was incorporated in a letter dated October 19, 1955, to the Adjutant General as follows:
Mr. Reese’s compensation claim was rated under Code 6513 and it was shown that he is 10 percent disabled by reason of sinusitis, maxillary, right, incurred during his period of service other than war time and therefore entitled to peace time rates in the amount of $14 monthly from May 3, 1955.
It was_ shown that arthritis and other residuals of old injury, right hip joint, was not incurred in or aggravated by his military service and therefore service connection for this condition was not shown. Heart, lung and gastro-intestinal conditions are not service connected inasmuch as these conditions were not found on last examination, conducted by the Veterans Administration on June 30, 1955.
Mr. Reese’s claim was reviewed on the basis of the evidence of record, including a report of examination by this Administration dated June 30,1955.
10. (a) On 16 November 1955, the Adjutant General, by order of the Secretary of the Army, appointed a board of *961 officers to be known as tbe Army Disability Review Board, to which plaintiff’s case was referred.
(b) Plaintiff appeared before this board, with private counsel, on 9 December 1955, in support of his application for review dated 14 May 1955, and testified under oath. His counsel argued the case extensively.
(c) The findings of the Army Disability Review Board were as follows:
1. That Colonel William E. Reese, 0 507 949, FC-AUS, is physically unfit to perform the duties of his office, rank, or grade by reason of physical disability which existed prior to term of service, or was not service-connected.
2. That the cause of such unfitness is: Arthritis, severe, due to direct trauma, right hip joint, manifested by displacement of femoral head in ilium, posterior and superior, with marked incongruity of joint surfaces, 3%" leg shortening, marked limitation of rotation of the thigh, moderate limitation of abduction, pain on ambulation, and marked right-sided limp, secondary to fracture-dislocation of the right hip incurred in 1912, and acetabuloplasty, approximately 1924. Unchanged, with recurrence of symptoms of pain in right hip in 1947. Disabling; degree of severity, severe; VA Code 5010-5255.
3. That the approximate date of origin or inception of defect is: Existed Prior to Service.
4. That the defect was not incurred in time of war or national emergency.
5. That the defect was not the result of intentional misconduct or wilful neglect.
6. That the defect was not incurred during a period of unauthorized absence.
7. That the defect was not the proximate result of the performance of duty.
8. That the defect was not permanently aggravated by military duty.
9. That the defect was not incurred in line of duty (Existed Prior to Service).
10. That the defect was not incurred in combat with an enemy of the United States.
11. That the defect was not the result of the explosion of an instrumentality of war in line of duty.
12. That the defect is permanent.
13. The percentage of disability is: (Not applicable.)
14. That such unfitness is not the result of intentional *962 misconduct or wilful neglect and was not incurred during a period of unauthorized absence.
15. That such unfitness is (Not applicable) per-centum disabling in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration.
16. That such unfitness is permanent in accordance with accepted Medical Principles.
17. That such unfitness is not the proximate result of the individual’s performance of active duty.
18. That Colonel William E. Reese, 0 507 919, FC-AUS, became physically unfit to perform the duties of his office, rank, or grade on 22 December 1954.
Remarks: The Board carefully considered all the evidence presented by the Applicant and Counsel, and particularly took cognizance of the existence of bronchitis, chronic, mild, involving the middle and lower lobes of the right lung with partial contraction of the right middle lobe accompanied by localized emphysema in the right lower lobe as evidenced by the bronchograms introduced by Counsel. The Board did not consider this condition to be disqualifying for military service for his age, grade and branch of service.
Conclusions: The evidence of record is considered sufficient to establish the inception of the member’s disability, arthritis, right hip joint with limitation of motion and 3%" shortening of leg, as having been prior to military service. There is no convincing evidence of permanent aggravation by military service. Therefore, the disability is considered to be Line of Duty: No— Existed Prior to Service, not aggravated and not ratable.
(d) On 81 January 1956, the Adjutant General notified plaintiff as follows:
Further reference is made to thé application submitted for a review of your physical evaluation board case by the Army Disability Review Board.
As a result of physical evaluation board proceedings, the approved determination by direction of the Secretary of the Army was that you were physically unfit to perform the duties of your office, rank or grade by reason of physical disability, not the proximate result of the performance of duty (existed prior to term of service).
In consideration of your application, the Army Disability Review Board, established under authority of Section 802, Public Law 346 — 78th Congress, approved 22 June 1944, has carefully reviewed the findings and decision of the physical evaluation board in your case. *963 The Secretary of the Army has instructed me to advise you that as a result of this review, the previous determination is affirmed.
11. (a) On April 30, 1957, plaintiff filed an application for correction of his military record, expressing a desire to appear before the Correction Board and to he represented by counsel. In it he requested that correction be made to show that he was retired with 75 percent disability because the record was in error “in that it does not show that my disability is service connected.” In support of the application he submitted (1) “my entire 201 file,” (2) “my medical file,” and (3) “the ADBB transcript.”
(b) On 22 August 1957, the Adjutant General wrote plaintiff as follows:
I have been requested by the Army Board for Correction of Military Becords to make further reply to your request for correction of your Army records.
The administrative procedures established by the Secretary of the Army for the guidance of the Army Board for Correction of Military Becords provide that the Board may deny an application where a sufficient basis for a review has not been established.
Following examination and consideration of your Army records together with such facts as have been presented by you, the Army Board for Correction of Military Becords on 31 July 1957, determined that insufficient evidence has been presented to indicate probable material error or injustice. Accordingly, your application was denied.
You are privileged at any time to submit to the Board for consideration new and material evidence not previously considered.
12. Applicable Army Begulations provided as follows:[8]
28. Action by board. — a. The board will, upon completion of the hearing, meet in closed session and make recommended findings as follows (par. 31) :
* * *
(5) In the case of a member specified in paragraph 2a (1), _(2), (3), or (4), whether the disability, or aggravation thereof, was incurred while entitled to re *964 ceive basic pay and, if the member has less than 8 years of service, whether the disability, or aggravation thereof, is the proximate result of the performance of active duty. During a period of active service in time of war, or national emergency, any disability shown to have been incurred in line of duty will be considered to be the proximate result of the performance of active duty. In determining whether the disability of a member was incurred prior to entrance into service and, if so, whether it was aggravated thereby, the principles set out in AR. 600-140 will be followed. (SR 600-450-5,12 Jul 51)
‡ sgt $
c. Presumptions. — Injury, disease, or death incurred by a member of the Army while on active duty, active duty for training, or during inactive-duty training, or by a cadet at the United States Military Academy, or by a member of the advanced course ROTO attending a summer camp will be presumed to have been incurred in line of duty and not because of the member’s own misconduct.
d. Evidence required to rebut presumptions.
(1) Line of duty. — The presumption favoring line of duty may be overcome only by substantial evidence that the injury, disease, or death, or condition causing injury, disease, or death—
(a)-(b) * * *
(c) Was contracted or incurred while neither on active duty or engaged in authorized training in an active- or inactive-duty status and was not aggravated by the service (par. 2c).
2 * ❖ *
c. Injury, disease, or death, or condition causing injury, disease, or death sustained or contracted while neither on active duty nor engaged in authorized training in active- or inactive-duty status. — Irrespective of length of service, a member of the Army will be presumed to have been in sound physical and mental condition upon entering active service or authorized training in an active- or inactive-duty status. In order to overcome this presumption, it must be shown by substantial evidence that the injury, disease, or death, or condition causing injury, disease, or death was sustained or contracted while the individual was neither on active duty nor engaged in authorized training in an active- or inactive-duty status. Further, even if the foregoing presumption is overcome by such evidence, it is presumed that any additional disability or death resultmg from the preexisting injury, disease, or condition was caused *965 by service aggravation thereof. Only specific findings of “natural progress” of the preexisting injury, disease, or condition, based upon well established medical principles, as distinguished from medical judgment alone, are sufficient to overcome the presumption of service aggravation. Disability having its inception in “line of duty” in one period of service or authorized training in any of the uniformed services (as defined in sec. 102(a), Career Compensation Act of 1949), if recurring or aggravated during a subsequent period of service or authorized training, regardless of the intervening time or difference in grade or other status (for example, disability incurred in line of duty by an enlisted man which subsequently recurs or is aggravated while the individual is serving on active duty, or engaged in authorized training as a warrant or commissioned officer), should be deemed to have recurred or have been aggravated in line of duty, unless such recurrence or aggravation is determined to fall within the purview of a or & above. Injuries or death sustained by members of the Army directly resulting from mental unsoundness having its inception at a time when the individual was neither on active duty nor engaged in authorized training in an active or inactive duty status should be considered to have been incurred not in line of duty, although not because of the individual’s own misconduct.
(1) Presumption of sound condition. — Medical judgment alone, as distinguished from well established medical principles, will not be considered the “substantial evidence” required to rebut the presumption of-a member of the Army’s sound condition at the time of his entrance into active military service. However, manifestation of lesions or symptoms of chronic disease, so close to the date of the patient’s entry into active service that could not have originated after such entry, constitute “substantial evidence” that the disease existed prior to the entry. Likewise, manifestation of disease within less than the required minimum incubation period after the patient’s entry into active service will be “substantial evidence” of inception prior to the service.
(2) Service aggravated condition. — Any increase in disability during active service resulting from a condition that existed prior to the active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the basis of well established medical principles. Medical or surgical treatment furnished during service for preexisting conditions does not of itself establish service aggravation. Mere recurrences of *966 certain diseases within 'a short period after the patient’s entrance into active service such as epileptic seizures, seasonal asthma, recurrent dislocations, etc., do not establish service aggravation. Also, incapacitating defects due to certain diseases, such as neoplasms, most endocrine disturbances, epilepsy, arteriosclerosis, and arthritis, and other chronic and degenerative diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless ■there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of preexisting conditions, and not be incident to or aggravated by service. Acute infections such as pneumonia, active rheumatic fever (even though recurrent), acute pleurisy, acute ear disease, and sudden developments, as hemoptysis, lung collapse, perforating ulcer, decompensating heart disease, coronary occlusion, or thrombosis or cerebral hemorrhage, occurring while in service will be regarded as service-incurred or service-aggravated, unless it can be clearly and unmistakably shown that there was no increase in severity during active service. i(AR 600-140, 12 Feb. 53)
13. (a) The record in this case consists of plaintiff’s first amended petition, defendant’s answer thereto, a stipulation of facts submitted by the parties at a pretrial conference, and the pertinent records of the Department of the Army and the Veterans Administration that were received in evidence as Joint Exhibits.[9] In addition thereto, plaintiff appeared and testified briefly at a trial session. No further testimony was presented by either of the parties.
(b) In the course of proceedings before the Army Disability Review Board on December 9, 1955, plaintiff presented (in addition to his own testimony) the testimony of a medical witness which testimony was directed to possible aggravation of chronic bronchitis.
(c) Neither party has presented to the court any medical testimony regarding the injury to plaintiff’s hip or the question of service aggravation of that condition by reason of arthritis or otherwise.
*967 RECAPITULATION
14. Plaintiff served in the Army as an enlisted man during World War I and as an officer during World War II.[10]
15. (a) Plaintiff suffered the fracture of his right hip prior to his service in World War I. He was accepted by the draft for limited service in 1918. The fracture defect was noted at the time. "Whether or not he signed a waiver in connection with his enrollment does not appear from the evidence.
(b) Plaintiff did sign waivers of the hip fracture prior to his commission in the Army Specialist Corps in August 1942 and in the Army of the United States in December 1942. As far as appears from the evidence these waivers consisted only of acknowledgment of the existence of the physical defects described. There is no evidence of what, if anything, the Army waived in connection with the injury. The Army did, however, in each instance authorize the waiver.
16. (a) On the basis of the diagnosis made by the Medical Board, both the Physical Evaluation Board and the Physical Review Council identified plaintiff’s arthritis with his hip *968 fracture and discussed them as constituting a single defect.[11]
(b) In the absence of medical evidence pertaining to this assumed identity, there exists in the record no foundation for challenge of the administrative findings as lacking in support by substantial evidence.[12]
17. (a) The failure of the Physical Evaluation Board and the Physical Disability Review Board to enter findings based on plaintiff’s contention that his 1947 attack of pneumonia (influenza) constituted “an abrupt and sudden pathological development” within the meaning of AR 600-140 must be deemed a rejection of the contention, particularly in view of the Medical Board’s specific finding that “there is no evidence of any specific episode of trauma which could be considered to have aggravated his degenerative (traumatic) arthritis.”
(b) In the absence of medical testimony on the subject, no foundation exists for challenge of the Medical Board’s finding or the apparent acceptance thereof by the Physical Evaluation Board and the Physical Review Council as lacking in support by substantial evidence.
18. (a) The Physical Review Council qualified its finding by saying: “There is no convincing evidence of permanent aggravation by military service.” This conclusion was likewise concurred in by the Physical Disability Appeal Board, the Physical Disability Review Board, the Veterans Administration and, by implication, by the Correction Board.
(b) There is no adequate foundation in the record for challenging this finding, as a finding of fact, as lacking in support by substantial evidence.
(c) Whether or not this finding by the Physical Review Council (adopted by all subsequent boards) was error in view of the controlling Army regulations is the dispositive issue in the case.
*969 Conclusion or Law
Upon, the foregoing findings of fact, wbicbi are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of the recovery is reserved for further proceedings under Buie 47(c).

The opinion, findings of fact, and recommended conclusion of law are submitted under tbe order of reference and Rule 57(a).

 “The retired pay of any officer of any of the services mentioned in the title of this Act who served in any capacity as a member of the military or naval forces of the united States prior to November 12, 1918, hereafter retired under any provision of law, shall, unless such officer is entitled to retired pay of a higher grade, be 75 per centum of his active pay at the time of his retirement.” Public Law 607, 77th Cong., approved June 16, 1942, cited as the Pay Readjustment Act of 1942, ch. 418, 56 Stat. 359, § 15, para. 4, at 368, 37 U.S.C. (1952 ed.) § 115 unchanged through 1955. Cf. Public Law 351, 81st Cong., approved October 12, 1949, cited as the Career Compensation Act of 1949, ch. 681. 63 Stat. 802, § 520, at 834, 37 U.S.C. (1952 ed.) § 31 unchanged through 1955, and § 531(b) (34) at 839.

 His total service at that time was less than 14 years.

There Is a clear Inference from his medical reports of this period that he was seeking retirement because of disability.

 As previously noted, tile Medical Board and all subsequent boards assumed that the arthritis was present BPTS.

 The Physical Evaluation Board affirmatively found that the disability was aggravated by service. The Physical Review Council found only that there was no convincing evidence of permanent aggravation by military service. No affirmative evidence was adduced that the disability was not aggravated by service.

 Plaintiff wag born on December 29, 1894, in Robinson, West Virginia.

 At tbe time of discharge he was serving in the grade of corporal with the 808th Aero Repair Squadron.

 Throughout the evidence various dates are given for the injury, the open reduction, and the acetabuloplasty. The dates cited in these findings are considered the more reliable. Ini any event, differences of a year or two would not be material.

A Report of Physical Examination by the united States Veterans Insurance Medical Service in November 3928 recited “Practically no pain in right hip. Occasionally muscles suffer slightly from climatic influences.” The physical examination was made as a result of plaintiff’s claim for reimbursement of the cost of his operation (which was denied). The rating was: “Old fracture, right femur, upper third 3" shortening, P.O. reduction, new socket, existed prior to enl„ noted at the time of acceptance and enrollment and not agg. by service. * * *”

 Following is the text of the Consultation Report of Orthopedist:
“Patient gives a history of fracture of the ‘right hip’ when 18 years of age. One year after the injury, an open reduction and nailing of the fractured femoral neck was performed. Had no trouble until after the World War when the hip again became painful and had difficulty walking. In 1925', Dr. Curtis Hall, Washington, D.C., performed an arthroplasty of the hip joint. Since recovery from the operation, has had no difficulty other than shortening in length of the right leg necessitating a raise in the right shoe. Is able to walk long distances and perform heavy physical exercise.
“Examination: Patient has 3 inches apparent shortening in the right leg. Motor power is excellent. Range of motion limited in abduction to 35 degrees, adduction to 15 degrees, internal rotation to 20 degrees, external rotation to 0-5 degrees. Elexion and extension are practically normal. Trendelen-burg sign is negative. Though the X-ray shows the head of the femur above the acetabulum, the shelving arthroplasty operation in 1925 was successful and the head is well supported against the pelvis when the patient is upright.
“Impression: Fracture, old, neck of femur and acetabulum, right. Due to the age of the patient at the time of injury this may well have been a case of slipped epiphysis. In spite of shortening and limitation of motion (mild), this patient has been able to perform moderate physical exercise since 1925 without difficulty. Although the condition appears to be stationary at this time, because of the chronic dislocation of the femur from the acetabulum, in my opinion this condition is disqualifying for any type of military duty.”

 On November 9, 1959, the Secretary of the Army certified plaintiff’s service after 17 December 1942 as follows: “* * * promoted to Lieutenant Colonel, Army of the united States, 23 April 1945; appointed Lieutenant Colonel, Finance Department, Officers’ Reserve Corps, 11 March 1948, accepted 30 March 1948; appointed Lieutenant Colonel, Finance Corps, united States Army Reserve, 10 October 1952, accepted 13 November 1952 ; promoted to Colonel, Army of the united States, 25 August 1953 ; appointment as Colonel, Army of the United States terminated 2 May 1955 ; promoted to Colonel, Finance Corps, United States Army Reserve, 3 May 1955 ; transferred to the Retired Reserve, 11 August 1955 ; he is now a Colonel, Retired Reserve. He is credited with the following periods of active service : enlisted, from 27 August 1918 to 9 January 1919; commissioned, from 18 December 1942 to 2 May 1955.”

 Within the meaning of AR. 600-140. Cf. finding 12, infra.

 These provisions are as set forth in plaintiff's requested finding No. 11. Defendant’s brief to the commissioner asserts (p. 19) that “the principal regulations are correctly quoted and set forth in plaintiff’s proposed Finding No. 11 * *

 Some of the medical records from the Orient were so sketchy as to be unintelligible. There are Indications that the medical record as a whole was incomplete.

 The significance of service during botli wars lies in the potential application of the following statutory provisions :
Public Law 607, 77th Congress, approved June 16, 1942, cited as the Pay Readjustment Act of 1942, ch. 413 of 56 Stat. 359, § 15, para. 4, at 368, 37 U.S.C. (1952 ed.) § 115 unchanged through 1955 :
“The retired pay of any officer of any of the services mentioned in the title of this Act who served in any capacity as a member of the military or naval forces of the united States prior to November 12, 1918, hereafter retired under any provision of law, shall, unless such officer is entitled to retired pay of a higher grade, be 75 per centum of his active duty pay at the time of his retirement.”
Public Law 351, 81st Congress, approved October 12, 1949, cited as the Career Compensation Act of 1949, ch. 681 of 63 Stat. 802, § 520, at 834, 37 U.S.C. (1952 ed.) § 319, unchanged through 1995:
“Any provision of law which, on the date of enactment of this Act, entitles any person to be retired, to receive pay, retired pay, retirement pay, or retainer pay, or other monetary benefit, and which is directly repealed, impliedly repealed, or amended by the provisions of this Act, shall, if the entitlement of such person to such retirement, pay, retired pay, retirement pay, retainer pay, or other monetary benefit is saved by the provisions of this Act, be continued in full force and effect for such entitlement and for such a time as such entitlement may exist.”
Section 531(b) (34) of the Career Compensation Act of 1949, 63 Stat. 802, 839, excepting paragraph 4 of section 15 of the Pay Readjustment Act of 1942 from the repeal of that Act.

 The Physical Evaluation Board described plaintiff’s disability as “arthritis, severe, due to direct trauma,” ascribing the arthritis to the hip fracture.
The Physical Review Council found that “[t]he evidence of record is considered sufficient to establish the inception of the member’s disabUity, arthritis * * * as having been prior to military service.”

 The evidence of record would, however, indicate to a nonmedical reviewer that the arthritic condition was certainly unknown to plaintiff and probably nonexistent prior to his commission in 1942.