Per Curiam:
This case was referred to Trial Commissioner W. Ney Evans with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on June 12,1967. Defendant has filed no exceptions to or brief on tliis report and the time for so filing pursuant to the Bules of the court has expired. On July 17, 1967, plaintiff filed a motion that the court adopt the opinion, findings of fact, *358 and recommended conclusion of law, as filed by the commissioner, as the basis for judgment in the case, to which defendant has filed no opposition or response. Since the court agrees with the commissioner’s findings, opinion, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiff is, therefore, entitled to recover, and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Eule 47(c)(2).
OPINION OP COMMISSIONER*
Evans, Commissioner:
The plaintiff in this case was, at last report (April 25,1966), in the terminal stages of multiple sclerosis, after suffering from the disease for 20 years or more. When his claim was previously before this court, it was denied as time barred. Lipp v. United States, 157 Ct. Cl. 197, 301 F. 2d 674 (1962), cert. denied, 373 U.S. 932 (1963). It is now before the court under Private Law 89-215, approved March 1, 1966, authorizing waiver of the time bar.[1]
The findings of fact, initially made 'by the late Commissioner Eobert K. McConnaughey and adopted by the court as reported by him, are now retained, modified only insofar as necessary to update them.
Among the more significant facts established 'by the evidence are these:
(1) Multiple sclerosis is considered incurable.
(2) The diagnosis (identification) of the disease, always difficult, was not confirmed in plaintiff’s case until after his release from the service on January 26, 1946 (in the course of demobilization and not for physical disability).
(3) Medical opinion now unanimously relates the onset of the disease to symptoms known to have existed in 1941 (and possibly in 1940).[2]
*359 (4) During his military service, plaintiff never sought to be examined for physical disability and never requested an opportunity to appear before an Army Retiring Board.
The diagnosis of multiple sclerosis was confirmed in 1948, and relates back in time as hereinabove indicated. Plaintiff made his first request to appear before a Retiring Board on December 19, 1948. Further requests were made on May 26, 1949, and June 16, 1950. All three requests were denied. Beginning December 1, 1951, plaintiff applied to the Correction Board, and filed additional applications on March 15, 1954, July 10,1957, and July 29,1963 (the latter being after his claim was denied by this court). All of these applications were denied.
Each of the administrative denials listed above turned essentially on findings (1) that plaintiff had the disease prior to entry into the service; (2) that the condition was not aggravated by his service; and (3) that he had made no request for examination for disability prior to his separation.
The rationale of the administrative decisions is set forth in detail in the findings of fact. It reflects a sincere effort to reach sound conclusions that are fair to the officer, while at the same time protecting the integrity of the retirement system.[3]
However, a shift in emphasis upon what is required to reach sound conclusions in keeping with the integrity of the system results in changing the whole picture, and it is my opinion that the shift in emphasis is required in this case by the facts and the law. I have reference, specifically, to the presumptions (1) of sound physical condition upon entering service and (2) of aggravation by service, and the requirements for rebutting those presumptions. The presumptions and the requirements for rebuttal are set forth in Army regulations,[4] and an agency is, of course, bound by its own regulations. Service v. Dulles, 354 U.S. 363 (1957).
The presumption of sound condition upon entering active service obtained (at that time) unless “* * * clear and unmistakable evidence * * * demonstrates that the * * * disease * * * existed prior to * * * active service.” “Medi *360 cal judgment alone, as distinguished from well-established medical principles, will not be considered sufficient to rebut the presumption of * * * sound condition * * Finding 88 notes that “* * * no established medical principle has been shown that compels the conclusion” that plaintiff had multiple sclerosis prior to his entry into service in December 1940. The same finding notes that the record does not contain “clear and unmistakable evidence that demonstrates beyond a reasonable doubt that he had multiple sclerosis before he entered on active duty in December 1940.”[5]
In my opinion, plaintiff is entitled, on the facts of the case, to the benefit of the presumption of sound condition upon entering active service.
The record as a whole further supports the acceptance of the January 1941 episode (after plaintiff’s entry into service) as the recognized onset of the disease. Finding 35 relates that “* * * the first physical symptoms * * * are varied, and in themselves subtly ambiguous and inconclusive. More frequently than not they will sustain or assist a diagnosis of multiple sclerosis only when coupled with a subsequent medical history wherein a cumulation of later manifestations lends character, retroactively, to early symptoms which might be attributable to other causes in the absence of the later, more conclusive evidence * * *.” Finding 20 states that “the expert testimony for both parties * * * based upon a cumulation of more recent evidence * * * indicates no dissent from the view that the plaintiff was suffering from multiple sclerosis on January 10,1941.”
Accepting, for the purposes of discussion, the insistence in the administrative findings that the disease existed prior to active service, I would give plaintiff the benefit of the presumption of service-aggravation, since “only specific findings of ‘natural progress’ of the disease * * *, based on well- *361 established medical principles, are able to overcome the presumption of service-aggravated * * (Finding 33(b) g(2).) The last paragraph of finding 40 reads as follows:
In summary, it is impossible to find, among the cautious, conflicting, tentative statements of the authorities, any established principle that would sustain a generalized determination whether environmental factors do or do not aggravate multiple sclerosis. There is no clear or unmistakable evidence that they do or that they do not. There is ample proof that no one really knows.
Since “there is ample proof that no one really knows * * * whether environmental factors do or do not aggravate multiple sclerosis,” it is impossible for the Army to rebut the presumption. Siegel v. United States, 148 Ct. Cl. 420, 428 (1960). And this is the whole point in the shift of emphasis to which reference was made above.
It is unnecessary to be technical or legalistic in terms of the burden of proof or the burden of going forward.[6] The presumptions are stated in the regulations as are the requirements for their rebuttal. These requirements clearly place the onus on the Army.[7] If the presumptions are not rebutted, the serviceman is entitled to the benefit of them. He should not be deprived of these benefits because he cannot prove his case by “clear and unmistakable evidence” demonstrating his point “beyond a reasonable doubt,” or because he cannot adduce “established medical principles” to compel a conclusion in his favor. These standards apply to the Army as a condition for depriving tire serviceman of the benefit of the presumptions. If the Army is unable to meet the standards in a given case (such as the instant one) because too little is known of a specific disease (such as multiple sclerosis), such inability serves to give purpose and point to the adoption of the presumptions in the first place.
The conclusions follow (1) that plaintiff was in sound condition at the time he entered the service and (2) that he suffered from multiple sclerosis while in the service. The remaining question is the effect to be given to the fact that he did not seek examination for disability or appearance *362 before a Retiring Board prior to bis release from service. On this question, the decision of this court in Patterson v. United States, 141 Ct. Cl. 435 (1958) is in point.[8]
Donald T. Patterson entered on active military duty on February 3, 1941, and was released from active duty on March 9, 1946, not by reason of physical disability. Meanwhile, in September 1944, he suffered symptoms which were not then or at the time of his release identified as multiple sclerosis, but which were in 1948 related to such a diagnosis, which relationship was confirmed in 1951. In 1954, an Army Medical Board concluded that Patterson had incurred multiple sclerosis in 1944 while on active duty, and that “if the disease had been diagnosed in this early phase, the man would have been considered unfit for military service as of that date * * *.” A Physical Evaluation Board made similar findings and evaluated his disability (as of May 6, 1954) at 70 percent. The Physical Review Council, however, advised the Correction Board that the officer “was not qualified for disability retirement * * *” as of March 9, 1946, and the Correction Board ruled accordingly, concluding that “the applicant was not physically incapacitated at the time of his relief from active duty * * * to a degree sufficient to warrant his retirement for physical disability under the provisions of the Act of 3 April 1939.”[9]
The majority opinion in Patterson, supra, held[10] that “the decision of the Correction Board that the plaintiff did not qualify for disability retirement benefits from the time of his relief from active duty because his physical disability at that time was not sufficiently severe to warrant his receiving the benefits of the Act of April 3, 1939, was unsupported by the evidence before the Board and that it was also erroneous as a matter of law.” The court further noted[11] that “prior to the passage of the Career Compensation Act *363 of 1949, eligibility for disability retirement pay benefits did not depend on a finding that the officer involved was suffering from any particular degree of disability, but rather upon a finding that the officer had become incapacitated for active service and that the incapacity was an incident of his service.”[12]
As in Patterson, if the condition of the present plaintiff had been recognized as multiple sclerosis at the time now deemed to reflect the onset of the disease (January 1941), he would have been considered unfit for duty by reason of physical disability, and he would have been, under the ruling in Patterson, eligible for disability retirement. Applying these standards to the facts of the case, his records should have been corrected to reflect retirement for physical disability at the time of his release from active service on January 26, 1946. The action of the Correction Board in refusing to make the correction was not supported by substantial evidence and was contrary to law.
Findings op Fact
1. (a) Plaintiff[1] graduated from the School of Medicine of Creighton University, Omaha, Nebraska, in 1934. He was appointed first lieutenant, Medical Corps, Officers Keserve Corps, on July 30, 1934, performing active service as such with the Civilian Conservation Corps from August 9, 1934, to July 1,1935. He was reappointed first lieutenant, Medical Corps, Officers Beserve Corps, on July 30, 1939, and was ordered to, and entered upon, extended active duty in the Army as such on December 9, 1940. While on such extended *364 active duty, be successively was promoted in tbe Army of tbe United States to captain, to major, and, on January 4, 1946, to lieutenant colonel, and, on December 20, 1946, in the Officers Reserve Corps to lieutenant colonel, Medical Corps. He was relieved from active duty, in the grade of lieutenant colonel, by reason of demobilization, not for physical disability, on January 26, 1946. His commission as lieutenant colonel, Army of the United States, terminated on June 30, 1948, and he was honorably discharged from his commission as lieutenant colonel, Medical Corps, Officers Reserve Corps, on December 12,1952.
(b) He sues to recover an amount equal to the disability retirement pay of a lieutenant colonel with over 10 years’ service, computed in accordance with statute, less appropriate offsets, if any,[2] on the ground that under applicable laws, regulations, and policies in effect at the time of his relief from active duty on January 26, 1946, he was permanently incapacitated for active military service by reason of physical disability (multiple sclerosis) incurred in line of duty and incident to his extended active service in the Army from December 9, 1940, to January 26,1946, and that he is entitled to be paid, but has unlawfully been denied, the disability retirement pay of an officer of his rank and length of service.
(c) Plaintiff’s claim is timely brought pursuant to Private Law 89-215, approved March 1,1966, providing in pertinent part that “notwithstanding any statute of limitations pertaining to suits against the United States, or any lapse of time, or bars of laches or any prior judgment of the United States Court of Claims, jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render judgment upon the claim of Frank E. Lipp arising out of his service with the United States Armed Forces from the years 1940 to 1946.”
2. In September 1939, plaintiff formed a partnership with a Dr. C. J. Manganaro, a Creighton Medical School classmate, for the practice of medicine in Kimball, Nebraska. The *365 new partnership contracted to purchase a hospital in Kim-ball, thereby incurring heavy financial obligations.
3. On December 9, 1940, plaintiff was ordered to active duty with the United States Army under his commission in the Officers Keserve Corps. He had not requested active duty, and the orders were issued without regard to his consent, voluntary or otherwise. Having been married only a relatively short time, having a new son about 6 months old, and having only recently formed his medical partnership and begun practice, he was reluctant to enter the military service in peacetime but was not aware of any valid basis for avoidance of the orders placing him on active duty.
4. On December 10, 1940, plaintiff was physically examined by a board of medical officers and found to be in sound physical condition in every respect. He was found to be physically qualified for active service except for a deficiency of a quarter of an inch in height, which was waived. The report of this examination listed no neurological symptoms, nor any history of such symptoms.
5. On the morning of January 10, 1941, plaintiff, upon awakening, found the muscles of the right side of his face in spasm and felt numbness in his left arm and leg. After examination by Captain A. E. Montgomery, the Post Surgeon, at Fort Des Moines, and consultation with other Army medical officers, plaintiff was referred to Dr. Frank A. Ely, a specialist in neurology in Des Moines, Iowa. Dr. Ely diagnosed plaintiff’s illness as Bell’s Palsy which he attributed to anxiety and exposure to draft. After further consultation with Captain Montgomery and other Army medical officers, and because of the marked asymmetry of plaintiff’s face, he was referred to Dr. Walter D. Abbott, another specialist in neurology, in Des Moines, Iowa.
6. Upon examination by Dr. Abbott, and in reply to Dr. Abbott’s questions, plaintiff gave Dr. Abbott a history that included a severe stomach upset, which plaintiff attributed to some canned artichokes he ate shortly after his assignment to Fort Des Moines. Plaintiff later recalled that upon being questioned by Dr. Abbott as to whether he could recall a “pricking” sensation, he had informed Dr. Abbott that at the time his first child was bom, in 1940, he had felt a tingling *366 in his face, as if it were frozen or had “gone to sleep,” which sensation quickly disappeared when he saw his healthy and normal son and his wife speedily recovered. According to plaintiff’s recollection several years later, the “tingling” involved no facial paralysis, no unsteadiness, no involvement of vision, and neither in location, nature, persistency, nor effect was that sensation similar to the facial spasm which had caused plaintiff to seek treatment by Dr. Abbott.
7. Plaintiff also later recalled that he informed Dr. Abbott, at this time, that sometime during the fall of 1939, soon after his move to Kimball, Nebraska, he thought he had noticed some unsteadiness of gait but that the unsteadiness disappeared when a refractive error in his eyeglasses was corrected.
Dr. Abbott’s report, submitted to plaintiff in 1948, which is quoted in finding 19 and which purports to be a copy of Dr. Abbott’s report to Captain A. E. Montgomery on January 15, 1941, places the unsteadiness at the same time as the facial tingling in June of 1940, and, in contrast to plaintiff’s generalized recollection merely of a tingling sensation of the face, specifically describes the area covered by the pricking sensation as “over the entire distribution of the right trigeminal nerve.”
8. On March 11, 1941, plaintiff was hospitalized at Fort Des Moines, Iowa, for “gastro-enteritis, acute, catarrhal, cause undetermined,” and on March 12,1941, was discharged to duty as cured.
9. In May 1942, plaintiff was transferred from Fort Des Moines overseas to the Southwest Pacific theater of operations. He was stationed initially in Australia. In 1943, he was attached to the 15th Portable Surgical Hospital at Oro Bay, New Guinea, with which he remained until September 1944. The living and working conditions imposed upon all personnel attached to this unit were most strenuous. All lived and worked in tents. The nearest general hospital was in Melbourne, Australia. The 15th Portable Hospital at Oro Bay received and processed both Army and Navy casualties from various island and combat areas. Hours were long and the volume of work at times permitted neither rest nor relaxation. The pressure and tension of a steady procession of *367 casualties were unrelenting. There were repeated alerts, air raid warnings, and occasional enemy attacks. There was much rain and dampness. Food was canned. There were no fresh vegetables, and the only fresh fruit available was bananas and coconuts, occasionally obtained from the natives. During his 16 months on New Guinea, plaintiff suffered five malarial attacks which he treated himself. His vision deteriorated steadily from 20/40, right eye, and 20/30, left eye, uncorrected, at the time of his entry on active duty, to a bilateral rating of 20/200 in May 1945. Throughout the period of his overseas service, plaintiff continued to have recurrences of fatigue, unsteadiness, and fibrillary twitchings, none of which were officially reported. Plaintiff attributes his failure to report and seek treatment for these complaints primarily to the fact that he was involved in war which, at the time and place, had reached its most critical stage. He was in an area of heavy casualty where doctors were urgently needed. Moreover, he had been professionally advised, and believed, that his symptoms were merely nervous in origin and could be alleviated with supplementary vitamin intake, which he maintained.
10. On March 18, 1945, upon his return to the United States, plaintiff was assigned to the performance of medical duties at Hoff General Hospital, Santa Barbara, California, where he remained until July 30, 1945. He was then assigned to Fort Lewis, Washington, where he performed eye, ear, nose, and throat work until his release to inactive duty on J anuary 26,1946.
11. Plaintiff’s physical examination for release from active duty, dated September 17, 1945, showed defects of astigmatism, myopia, compound, bilateral, with vision uncorrected 20/200 and corrected 20/20; and flat feet, 2 degrees.
12. During his military service, plaintiff never sought to be examined and surveyed for physical disability, nor did he ever request the opportunity to appear before an Army Disposition Board or an Army Retiring Board. At the time of his release from active duty on January 26, 1946, he thought he was in pretty good health and felt that he was physically fit to perform active duty. Indeed, he did perform certain duties in the Army Beserves from January 26, *368 1946, the date of his release from active duty, to December 12, 1952, the date of his honorable discharge from his commission as a lieutenant colonel, Medical Reserve Corps.
13. Upon plaintiff’s release from active duty January 26, 1946, he took a residency at a hospital in New York, and pursued a course of study of ophthalmology.
14. (a) By application dated February 21, 1946, plaintiff filed a claim with the Veterans Administration. His application, which contained no mention of the episodes subsequently diagnosed as possibly indicative of multiple sclerosis, contained the following statements:
32. Nature of disease or injury on account of which claim is made and date each began.
Malaria — August 1943 Dental Caries — 1941 Epidermophytosis — December 1943 Papillomas — August 1944.
33. If you received any treatment while in the service, give name, number or location of hospital, first-aid station, dressing station or infirmary, or the organization to which it was attached, the dates of treatment, and nature of sickness, disease, or injury.
August 1943, APO 503, Pleadquarters Base B, attacks of malaria, self-treated.
December 1943, 362 Station Hospital, APO 503, hospitalized 1 week, treated for epidermophytosis.
1945, APO 927, Headquarters Base 7, fillings in teeth.
1941, Ft. Des Moines, Iowa, 1 extraction.
This application included the parenthetical remark “ (Since claimant is Doctor, treated self).”
(b) By rating, dated May 9, 1946, the Veterans Administration made the following determination:
No Percent (0%) from 1-27-46
MALARIA ON HISTORY
No Percent (0%) from 1-27-46
PES PLANUS, BILAT., NON SYMPTOMATIC
Mm-EPIDERMOPPIYTOSIS, HANDS & FEET
Not found on last examination of service records.
nn-PAPILLOMAS — Claimed by the veteran, not shown by the evidence of record.
15. By letter dated March 17, 1946, plaintiff inquired of the Department of the Army about an appointment in the *369 Regular Army. In reply, the Adjutant General informed plaintiff that March 1, 1946, had been the deadline set for receiving applications in the Regular Army, and that applications received after that date (as plaintiff’s had been) would not be considered.
16. On September 2,1946, plaintiff was admitted to Kings County Hospital, Brooklyn, New York, as a patient because of a severe attack of dizziness, nausea, vomiting, diplopia, loss of balance, prostration, nystagmus on upward gaze, and adiodokokinesis. He was released from the hospital on October 4, 1946, but his diplopia and other symptoms persisted for about 10 weeks. The hospital’s diagnosis, as subsequently reported to the Veterans Administration, was “Probably acute encephalitis but story of Bell’s Plasy [sic] 6 years ago with blurred vision suggests Devic’s Disease (atypical Multiple sclerosis).” [3]
17. In the summer of 1948, and again in December 1948, plaintiff suffered a recurrence of loss of equilibrium, numbness from the waist down, girdle pains, and diplopia. On June 14, 1948, he was examined by Dr. J. F. Gardiner, Omaha, Nebraska, who reached a tentative diagnosis of multiple sclerosis. On July 21, 1948, he was examined in consultation by Dr. Wilbur A. Muehlig, Omaha, Nebraska, a specialist in neurology. Dr. Muehlig’s diagnostic impression was multiple sclerosis.
18. On the same date, July 21, 1948, Dr. Muehlig also examined plaintiff for compensation by the Veterans Administration. In his report to the Veterans Administration, Dr. Muehlig’s discussion and diagnosis were as follows:
Discussion : Diagnosis of multiple sclerosis must be made largely from the history. While the objective findings at present are not sufficient to make this diagnosis, in connection with the past history it seems most likely that it is the proper diagnosis. It is likely that the episode considered to be a possible encephalitis in 1946 was actually part of the chronic illness.
CeRtificatiqn of Diagnosis : I believe this patient has multiple sclerosis and that the previous episode con *370 sidered to be encephalitis was actually a part of this illness, basing this on the present findings and on the past history as given.
19. On September 7,1948, Dr. Walter D. Abbott furnished plaintiff with the following statement, a copy of which, subscribed and sworn to before a notary, plaintiff sent to the Veterans Administration on September 14,1948:

To whom it may concern:

This is a copy of my report to Captain A. E. Montgomery on J anuary 15,1941.
Lieutenant Frank Lipp complains of a facial spasm on the right since June of 1940. He informed me that his father died at the age of 69 of carcinoma of the lung; the mother was living and well. He had two brothers and three sisters living and well and one brother died in infancy. A maternal uncle died of tuberculosis and his maternal grandmother died of diabetes. He has been married two and one-half years and has one child living and well, and his wife is living and well. He admits to moderate indulgence in coffee and tobacco. He underwent a tonsillectomy in 1917 and an appendectomy in 1929. He states that in June, right after his baby was born, he was very concerned about his wife because she went through an extremely difficult labor. He noted paresthesias, such as pricking sensations over the entire distribution of the right trigeminal nerve and also some unsteadiness which was corrected by a change in a refractive error. The paresthesias gradually subsided and in December when he was called into Service he noted paresthesias over the left side of the face and at that time underwent a negative neurological examination in Omaha. These subsided, but about a week ago he developed a spasm of the muscles around the right eye and angle of the right mouth and he feels that there is some asymmetry of the face. He also has noted an occasional unmbness [sic] of the left arm and leg. He 'has been well otherwise except for a recent gastrointestinal upset after eating canned artichokes.
My examination revealed a well developed and nourished male of 80. Height 5 feet 2% inches. Weight 140 pounds. There is a spasm of the right facial muscles particularly the orbicularis oculi and orbicularis oris on the right. The left nasolabial fold is not as deep but there is no definite weakness of the facial muscles on either side. The teeth appear normal and the tonsils have been cleanly removed. Examination of the heart, *371 lungs, abdomen, genitalia and rectum is negative, with the exception of a healed scar in the right lower quadrant of the abdomen. Examination of the nervous system otherwise is objectively negative. Blood pressure 112/84. Pulse 76. Temperature 98.6 degrees.
Because there was no nystagmus, change in the speech or absence of abdominal reflexes and because this was worse when he became tired or upset, I did not feel that this was a multiple sclerosis. Although the optic fundi revealed a slight pallor of the temporal margins of the discs, this is in keeping with a patient suffering from myopia which he does to a moderate degree. I did not feel that we cou'ld make a diagnosis of an organic neurological condition but rather was of the opinion that this was a fatigue manifestation and suggested the administration of rather large doses of vitamin B and ■more rest and recreation would correct this condition.
The mixed use of both the present and the past tense in Dr. Abbott’s statement of September 7, 1948, and especially the manner in which the past tense is used in the last paragraph, suggest that part at least of this statement may have been a reconstruction, based on his January 15, 1941, report, or on his notes, made at the time of the earlier report, rather than a direct quotation of its text.
20. Complete unanimity of the expert evidence supports the conclusion that, in the light of plaintiff’s subsequent medical history, Dr. Abbott was in error in rejecting, in January 1941, the diagnosis of multiple sclerosis. The evidence available to him then was far from conclusive, and he evidently shared an understandable reluctance, common among doctors, to reach a diagnosis of multiple sclerosis on the basis of vagrant symptoms, consistent with the existence of the disease, but potentially attributable to other, less ominous, causes. The expert testimony for both parties, however, based upon a cumulation of more recent evidence with that originally available to Dr. Abbott, indicates no dissent from the view that the plaintiff was suffering from multiple sclerosis on January 10,1941.
21. Taking into account the whole record, it appears that in some respects Dr. Abbott’s statement submitted to the plaintiff on September 7, 1948, reflects certain errors in his record, or in his recollection or understanding of the plaintiff’s medical history during 1939 and 1940.
*372 (a) It is by no means clear that plaintiff’s facial paraes-tliesias, which occurred in June of 1940, were, as reported by Dr. Abbott, contemporaneous with his reported “unsteadiness” which disappeared after a change of eyeglasses. Plaintiff’s recollection, as expressed in his affidavit, placed the “unsteadiness” in 1939 and, on the whole of the evidence, it appears more likely that the two symptoms of tingling and unsteadiness did not occur contemporaneously, as Dr. Abbott’s statement in 1948 appears to indicate.
(b) The composite force of the pertinent evidence strongly suggests that Dr. Abbott was in error in stating:
(1) that plaintiff’s complaint of a facial spasm on the right had persisted “since June of 1940,” and
(2) that plaintiff had noted paraesthesias over the left side of his face when he was called into active service in December 1940, and that he underwent a negative neurological examination at that time.
The only examination he had then was the medical examination given him on December 10, in connection with his induction into active service.[4] There is no indication that this involved such particular attention to neurological factors as would warrant describing it as a neurological examination, or that he mentioned to the examining doctor any facial spasm on the right or any paraesthesias of the face. The circumstances indicate that Dr. Abbott had mistakenly attributed to the date of plaintiff’s entry on active duty, December 9, 1940, the paraesthesias which, with other symptoms, began on January 10, 1941, immediately before plaintiff’s examination by Dr. Ely and had mistakenly related back to June of 1940 the facial spasm on the right which, also, plaintiff first noticed on January 10,1941.[5]
In view of plaintiff’s lack of enthusiasm for active military duty in December 1940, and his evident awareness of the fact that symptoms such as those Dr. Abbott described might indicate a serious condition that would disqualify him from active service, it is a reasonable conclusion that if he *373 had been currently aware of those symptoms at the time of his medical examination on December 10, 1940, he would have called them to the attention of the examiners. In these circumstances, the fact that he apparently did not mention either the facial spasm or paraesthesias of the face to the Army examiners on December 10,1940, is persuasive evidence that none then existed.
(c) The record leaves some doubt as to whether the description in Dr. Abbott’s statement of the facial tingling sensation experienced by plaintiff in June of 1940 as “over the entire distribution of the right trigeminal nerve” does not identify a broader and more precisely defined area than that which plaintiff intended to indicate to Dr. Abbott, in describing the 1940 symptom.[6]
22. On October 4, 1948, the Veterans Administration reconsidered plaintiff’s claim and, at that time, service connection was granted for multiple sclerosis.[7] This condition was evaluated as disabling to a noncompensable degree from date following discharge to September 26, 1946; 10 percent disabling from September 27, 1946, to July 18, 1948; and 30 percent disabling from July 19,1948.[8]
23. By letter dated December 19, 1948, plaintiff informed the Adjutant General that he was receiving “30% pension” from the Veterans Administration for multiple sclerosis and requested that he be permitted to appear before a “medical retirement Board.” On December 30, 1948, the Adjutant General responded that the policy of the Department of the Army with respect to authorizing an officer to appear before an Army Retiring Board applied only in cases where it was evident from records or from evidence submitted that the officer may have had, at the time of his relief from active duty, a physical defect, permanently incapacitating for active mili *374 tary service, which is incident to his active military service. The plaintiff was informed that any evidence available to him that would appear to justify his appearance before an Army Ketiring Board should be submitted to the Adjutant General for review.
24. (a) By a letter dated May 26, 1949, plaintiff again requested the Adjutant General that he be permitted to appear before an Army Retiring Board.
(b) On July 8, 1949, plaintiff’s request was sent to the Surgeon General for recommendation, and on July 11,1949, the Office of the Surgeon General expressed the following comment:
1. Department of the Army records, including correspondence, Army & VA clinical records, and AG 201 file, in the case of Lt. Colonel Frank E. Lipp, 0-321285, MC-AUS, have been carefully reviewed in this office.
2. Defect in question was not considered permanently incapacitating for general military service while on active duty.
3. Recommend officer not appear before an Army retiring board.
4. If this former officer is tracing onset of multiple sclerosis to symptoms of Bell’s palsy and diplopia re-reported to have occurred shortly after entering active duty, it would appear that the condition originated prior to entry on active duty.
(c) By letter dated July 18, 1949, the Adjutant General wrote the plaintiff, in part, as follows:
1. Reference is made to your letter of 26 May 1949, with inclosures, in regard to your request to appear before an Army retiring board.
2. Your entire record, including your letter with inclosures, and Army and Veterans Administration clinical records, has been carefully reviewed by competent medical authorities in the Department. The defect in question was not considered permanently incapacitating for general military service while on active duty. If you are tracing onset of multiple sclerosis to symptoms of Bell’s palsy and diplopia reported to have occurred shortly after entering active duty, it would appear that the condition orginated prior to entry on active duty. Under the circumstances, your appearance before an Army retiring board is not warranted and your request cannot, therefore, be favorably considered.
*375 3. The fact that you are entitled to compensation on a percentage basis under the general pension laws as administered by the Veterans’ Administration does not alter in any way the action taken by the Department of the Army. Veterans’ Administration benefits are awarded under different statutes and on a different basis from retirement pay benefits as determined by the Department of the Army. * * *
25. (a) Plaintiff again wrote the Adjutant General on June 16,1950, requesting “appearance and Medical retirement before an Army Retiring Board.”
(b)On July 13, 1950, the Adjutant General responded that his appearance before a Physical Evaluation Board (formerly Army Retiring Board) to establish his entitlement to physical disability retirement pay benefits was not warranted and that his request was not favorably considered.
26. (a) On December 1,1951, plaintiff filed a petition with the Army Board for Correction of Military Records, requesting a correction of his records to show “Disability retirement for Service connected diagnosis of Multiple Sclerosis”.
(b) On September 2,1952, the Army Board for Correction of Military Records requested comment and opinion from the Surgeon General’s Office as to whether plaintiff was eligible for and should have been retired for physical disability on January 26,1946.
(c)The Surgeon General’s Office advised the Army Board for Correction of Military Records on September 8, 1952, that the “evidence of record indicates that on 26 January 1946, under the laws, regulations and policies in effect at that time, Frank R. [sic] Lipp did not have any condition of sufficient extent to have warranted his retirement for physical disability.”
(d)On October 10, 1952, the Adjutant General advised plaintiff as follows:
_ I have been requested by the Army Board on Correction of Military Records to make further reply to your request for a correction of your Army records.
A thorough examination of your military records, together with the information submitted by you fails to disclose any evidence of error or injustice relative to your separation from active service not by reason of physical disability.
*376 The administrative procedures established by the Secretary of the Army for the guidance of the Army Board on Correction of Military Eecords provide that an application for a hearing by the board may be denied where a sufficient basis for review has not been established.
I regret to advise you that careful consideration by the Army Board on Correction of Military Eecords of your Army records, together with such facts as have been presented by you, fails to establish sufficient basis for a hearing of your case by the board. Therefore, in the absence of additional material evidence, no further action on your application is contemplated.
27. (a) On March 15, 1954, plaintiff filed an application with the Army Board for Correction of Military Eecords requesting correction of his record in the following particulars:
That my present illness be judged service connected, that my honorable discharge be amended to include medical retirement.
The record now fails to show my present illness, and that it became manifest while in service, and that this illness is always a reason for medical retirement.
Attached to plaintiff’s application was a statement, signed by the plaintiff, which asserted, in part, that he was a patient at Kings County Hospital, Brooklyn, New York, from September 27, 1946, to October 4, 1946. Plaintiff enclosed statements of two physicians who first examined him and made a diagnosis of multiple sclerosis in 1948 and 1949 (Dr. Wilbur A. Muehlig and Dr. J. F. Gardiner). Plaintiff also enclosed the affidavit of Dr. Walter D. Abbott, dated September 7, 1948, quoted in full in finding 19, and the following two letters from Dr. Abbott, addressed to the plaintiff:
Mat 19, 1953.
Dear Dr. Lp?p: On January 13,1941,1 examined you because of facial spasm on the right, involving the upper and lower branches of the seventh nerve and fatigue syndrome. It was noted in your examination that there was some pallor of the optic disc.
At that time I did not feel that you were suffering from multiple sclerosis, but was of the opinion that this could have been an early symptom.
Sincerely yours
Walter D. Abbott, M.D.
*377 October 1,1953.
Dear Doctor Lipp: I have carefully reviewed my history obtained from you when you were referred to me by Captain Montgomery in January of 1941, at which time you gave a history of some parasthesias of the face in June of 1940 right after your baby was born, your wife had a very difficult time and you were very worried about her at this time; however, you did not notice any spasm of the right facial muscles until a week prior to the time you were referred to me. I felt that this was a blepharospasm on the right as the result of fatigue, and although the question of multiple sclerosis was considered at that time I could not make a definite diagnosis of such.
Please advise me if I may be of further help to you.
Sincerely yours,
Walter D. Abbott, M.D.
(b) On May 31, 1955, the Army Board for Correction of Military Eecords requested the Surgeon General’s Office to consider the case further in view of the additional evidence submitted by the plaintiff, and to furnish a detailed comment and opinion covering its review.
(c) On June 3, 1955, the Surgeon General advised the Army Board for Correction of Military Eecords as follows:
1. Eecords in the case of Lt. Colonel Frank E. Lipp, 0-321285, have 'been carefully reviewed in conjunction with the psychiatry and neurology consultant to The Surgeon General.
2. A review of all available records indicates a history of transient neurologic symptoms as early as June 1940, (prior to active duty) and January 1941, (after entry).
3. In view of the subsequent diagnosis of multiple sclerosis, it is probable that the transient symptoms in June 1940 and January 1941 and later, were early manifestations of the disease, since this type of history is quite common in multiple sclerosis.
4. The same evidence leading to the opinion that subject had multiple sclerosis prior to separation from active duty leads to the opinion that he had multiple sclerosis prior to service.
5. Multiple sclerosis is disqualifying for entry into military service whether or not it is in remission.
6. It is the opinion of The Surgeon General that Lt. Colonel Lipp had multiple sclerosis prior to entry on active duty and that the condition was not aggravated by military service but due to natural progression.
*378 (d) On June 28, 1955, the Special Assistant, Office of the Secretary of the Army, “directed case for formal hearing by ABOME in view of the symptoms manifested while the appl [sic] was on active duty and the disqualifying nature of the disease involved.”
28. (a) On October 26, 1955, plaintiff appeared and testified at a hearing before the Army Board for Correction of Military Records. The proceedings of the Board disclose that the Board had before it, along with other evidence, the following statements by Dr. Wilbur A. Muehlig and Dr. J. F. Gardiner:
Max 13, 1949.
(1) Adjutant General,
Washington, D.O.
Re: Lt. Colonel Frank E. Lipp 0-321-285
Dear Sir : I am writing to you to report my findings on the above mentioned patient, Lt. Colonel Frank E. Lipp, at his request. I first examined this man on July 21,1948.
Chief Complaint: Tingling sensation from the waist down and slight unsteadiness on feet.
History : In January, 1941, patient had a sudden onset of what seemed to be a left facial weakness resembling Bell’s palsy and associated with spasm of the right side of the face. There were also some paresthesias of both sides of the face. This condition cleared up in about six weeks.
In September, 1946, patient had an illness in which there was diplopia, nausea, vomiting, and a spinning sensation associated with a disturbance of balance. The possibility of encephalitis was considered at that time, although according to the patient there was no increase in the spinal fluid cell count and he had no fever. The symptoms cleared up in about 2y2 months.
Two weeks ago, the patient 'began to notice a tingling sensation from the waist down bilaterally. He states that his skin felt tight. On two occasions he fell on the stairs, apparently due to the interference with the sensation in his legs and feet. Also during the past two weeks he has noticed a slight tenderness of the skin around his waist off and on. This was burning in nature. There has also been a full-feeling at his anus.'
*379 Patient states that although he is inclined to worry quite a bit, he believes his nerves have always been under good control.
Examination: motor function: Patient walks rather carefully and less rapidly than normal. He is slightly unsteady on his feet. In standing with his feet to- § ether he is fairly steady even with his eyes closed. 'trength apparently normal throughout and coordination tests essentially normal except as above. sensation: Sense of motion and position is slightly decreased in the toes bilaterally. Vibratory sense is slightly decreased in the lower extremities. Pain sense seems to be slightly increased from the waist down. Otherwise sensation normal throughout.
Rett,exes 5 Deep reflexes are equal and normal. No Babinski or Ohaddock.
cranial nerves: Left pupil is slightly larger than right. Optic discs negative and other cranial nerves negative throughout.
Diagnostic Impression : Multiple sclerosis.
Discussion : Diagnosis of multiple sclerosis must be made largely from the history. While the objective findings at present are not sufficient to make this diagnosis, m connection with the past history it seems most likely that it is the proper diagnosis. It is likely that the episode considered to be a possible encephalitis in 1946 was actually part of the chronic illness.
Mat io, 1949. Patient returned for re-examination at this time. He states that during the four or five weeks after he last saw me, his sensation gradually returned to normal, leaving him only with a numb sensation and some tingling on the bottom of his feet. He has continued to have this although does not notice it most of the time.
In December of 1948, the patient developed diplopia which lasted for about three weeks.
During the past 10 days, the patient has had a slight slurring of his speech which has remained about the same since its onset. On examination, the patient is found to have a rather definite slurring and thickening of his speech. Pie is possibly slightly less steady in balancing on either foot with his eyes closed than *380 normal and sense of motion and position in the toes is possibly slightly less acute than normal. Otherwise neurological examination negative throughout.
The subsequent course of this case as given in my note of May 10, would tend to verify the diagnosis of multiple sclerosis.
Sincerely yours,
WlLBTJR A. Muehlig, M.D.
Mat 21,1949.
(2) Adjutant General,

Washington (25),D.O.

Reference: Frank E. Lipp, Lt. Col., M.C. 0-321285
DeaR Sir: Dr. Frank Lipp, formerly a Lt. Col. in the Medical Corps of the Army of the United States, was examined in my office on June 14th, 1948, five days after the onset of tingling sensations in the legs, thighs and feet. He gave the following history:
He entered extended active duty in the Army of the United States in December, 1940, and a few weeks later developed Bells Palsy, accompanied by mild diplopia. A tentative diagnosis of cerebellopontine angle tumor was entertained by attending medical officers and he was seen in consultation by Dr. Walter D. Abbott of Des Moines. Dr. Abbott’s examination was negative for evidence of organic neurological disease and he believed the symptoms due to nervous exhaustion and tension.
Dr. Lipp continued on active duty and in 1945 contracted a malarial infection due to Plasmodium vivax. At the time of his examination he had had nine recurrences of malaria, the most recent in March, 1946. In September, 1946 while a resident at Kings County Hospital in New York, he developed nausea and severe diplopia which lasted ten weeks. He was seen at that time by several noted specialists in various fields. Final diagnosis, on a purely clinical basis, (and because of previous history) was encephalitis or multiple sclerosis. The spinal fluid was negative on routine examination and also for virus on culture at Rockefeller Center. He had no trouble following that illness. All the tingling of the body and extremities from the waist down developed five days before he present [sic] himself for examination.
There had been no vertigo or staggering but he has been conscious of taking extra precautions against unsteadiness in gait. There have been no sphincteric *381 disturbances but sensation is marked about the anus and genitalia.
The physical examination was not remarkable other than the diminution of vibratory sense in the legs, its absence in the feet, and decreased activity of the abdominal and cremasteric reflexes on the right. The blood pressure was 135 systolic and 78 diastolic. The pulse was full and regular, its rate 80. The oral temperature was 99° F. The hemoglobin content of the blood was normal, the erythrocytes numbered 4.54. The leukocytes numbered 8,900, the differential was normal. The sedimentation rate (Wintrobe) was 12 mm (one hour). The blood serology was negative. The basal metabolic rate was minus 4%. Two voided specimens of urine were negative except for a trace of albumin in the morning sample. Fractional gastric analysis showed normal values for free and combined hydrochloric acid.
It was felt, in view of the history, and the positive neurological findings, that clinically, at least, multiple sclerosis was indeed possible if not probable. He was seen in neurological consultation by Dr. Wilber [sic] Muehlig, who concurred in this diagnosis. Dr. Lipp has remained under observation to the present. In December, 1948, he was incapacitated several days with a recurrence of the nausea and diplopia previously experienced. About the first of May, this year, he noticed inability to enunciate the consonants during conversation. The impression that this represented an exacerbation of the process was confirmed by Dr. Muehlig. Continued observation will be necessary to determine the extent and duration of this recurrence.
In retrospect it would seem that this is certainly a case of multiple sclerosis and that all the episodes since December, 1940, represent but a few of the bizarre and varied symptoms possible in this disease whose protean nature is its outstanding characteristic.
Yours very truly,
J. F. Gardiner, M.D.
(b) On October 31, 1955, the Army Board for Correction of Military Records made the following findings, conclusions, and recommendation:
THE BOARD KINDS I
1. That the applicant has exhausted all administrative remedies afforded him by existing law or regulations.
*382 2. That it incorporates and adopts by this reference, so much of the Case Summary, Exhibit “C” above, as pertains to the factual showing of the Department of the Army records which generally reflect:
a. that the applicant entered on active duty as a First Lieutenant, Medical Corps, Officers Reserve Corps, on 9 December 1940; that on 15 January 1941 he was referred to Dr. Walter D. Abbott for neurological consultation ; that he informed the doctor that in June 1940, prior to entrance on active duty, he had noted neurological sjunptoms; that these had subsided but that subsequent to entrance on active duty he had noted further like symptoms; that the examining physician was of the opinion that this was a fatigue manifestation and that he could not make a diagnosis of multiple sclerosis; that he was hospitalized in March 1941 for acute ca-tarrhal gastro-enteritis in February 1944 for malaria and in August 1944 for a skin eruption; that an ophthalmo-logic examination in May 1945 showed a diagnosis of astigmatism and conjunctivitis; eye muscle balance showed orthophoria at near; that physical examination for separation noted defects of astigmatism, myopia and flat feet, and found him fit for general military service;
b. that on 3 June 1955 the Surgeon General’s Office expressed opinion that there was a history of transient neurologic symptoms prior to entry on active duty and subsequent thereto; that these symptoms were probably early manifestations of multiple sclerosis and led to the conclusion that the disease had its inception prior to entrance on active duty, and was not aggravated by military service; and
c. that the records of the Veterans Administration reflect that the applicant was awarded disability compensation for multiple sclerosis evaluated as non-disabling from the date of separation, 10 per cent disabling from 27 September 1946 to 18 July 1948 and 30 per cent disabling since that date.
THE BOARD CONCLUDES:
1. That in view of the medical evidence of record, it concurs in the opinion of the Surgeon General’s Office that the applicant had multiple sclerosis prior to entry on active duty and that the condition was not aggravated by military service.
2. That in view of the foregoing, the applicant’s relief from active duty on 26 January 1946, not by reason of physical disability, was not in error or unjust.
*383 THE BOARD RECOMMENDS:
That in the case of prank e. lipp, bis application for correction of military records, dated 15 March 1954, be denied.
29. On November 17, 1955, the Assistant Secretary of the Army took the following action in the case:
MEMORANDUM POR THE ADJUTANT GENERAL:
Having approved the findings, conclusions and recommendation of the Army Board for Correction of Military Records in the case of prank e. lipp, 0 321285, and under the provisions of Section 207 of the Legislative Reorganization Act of 1946, as amended (Public Law 220, 82d Congress) and General Orders 67, dated 10 September 1954, it is directed:
That in the case of prank e. lipp, his application for correction of military records, dated 15 March 1954, be, and hereby is, denied.
30. By letter dated July 10,1957, Attorney Louis E. Lipp, plaintiff’s brother, requested a reconsideration of plaintiff’s application for a correction of his military records. The Assistant Secretary of the Army made the following reply to this request on September 13,1957:
This is in reply to your letter of 10 July 1957 concerning a request for reconsideration of his application for correction of military records in the case of your brother, Dr. Frank E. Lipp. Dr. Lipp’s application requested that his military records be corrected to show him retired for the physical disability of multiple sclerosis on 26 January 1946, the date of his relief from active duty by reason of demobilization.
In summary the records reflect that Dr. Lipp entered on active duty as a First Lieutenant in the Medical Corps on 9 December 1940 and that a physical examination accomplished the following day did not reflect any conditions, defects or symptoms which might be attributed to multiple sclerosis. Approximately one month after entry into the service Dr. Lipp was referred to a specialist in neurosurgery, one Dr. Walter D. Abbott. Dr. _ Lipp at that time gave a history of transient neurological symptoms in June 1940, prior to his entrance on active duty, and again in January of 1941.
*384 Dr. Lipp served for nearly three years in the Southwest Pacific area from May 1942 until March 1945 and he was treated during this period for gastroenteritis, malaria and eruption on his face, hands and feet. Prior to his relief from active duty he underwent a physical examination for separation and at that time was found physically fit for general military service. .
. On 21 February 1946 he filed an application, for disability compensation with the Veterans Administration but was found to have no compensable, disability. In July 1948 a diagnosis of multiple sclerosis was effected. The Veterans Administration then reconsidered his claim and awarded service, connection for multiple sclerosis rated zero per cent disabling from the date of his relief from active duty until 26 September 1946, 10 per cent from that date to 18 July 1948 and 30 per cent from 19 July 1948.
In 1948 Dr. Lipp requested appearance before an Army Retiring Board. The case was reviewed in the office of the Surgeon General of the Army in 1949 and on three subsequent occasions. In each instance it was felt that the evidence of record indicated that multiple sclerosis had its inception prior to service; that Dr. Lipp had not 'become incapacitated for active service prior to his relief therefrom and that there had been no abnormal aggravation of the condition while in the service in excess of the normal progression rate.
On 26 October 1955 Dr. Lipp was granted a formal hearing before the Army Board for Correction of Military Records. Dr. Lipp appeared in person before the Board together with his designated counsel and every opportunity was afforded him for a complete presentation of all elements of evidence in support of his contentions. Following full and fair consideration the Board unanimously determined to deny the application.
The Board concluded that in view of the evidence of record, Dr. Lipp had incurred the disease of multiple sclerosis prior to entrance on active duty but that the condition was not aggravated by military service to such a degree as to render him unfit for service prior to his release from active duty. This position was supported by professional opinion from specialists in the field of medicine concerned and was further evidenced by the record of the applicant’s physical capacity for discharge of his military duties, the absence of notable symptoms or need for treatment for his condition while in the service and the evaluation by the Veterans Administration that he did not have a compensable disability at time of relief from active duty.
*385 The recent evidence submitted in support of Dr. Lipp’s request for reconsideration of bis case consists essentially of a restatement by various physicians and witnesses of the same points raised by Dr. Lipp in his original application and at the formal hearing before the Board. I feel that the material submitted is not of such a nature as to warrant reconvening the Board in formal session for further hearing. This, of course, does not preclude the possibility for further reconsideration of Dr. Lipp’s case but such reconsideration must of necessity be based upon new material evidence of such nature and substance that it might reasonably be expected to cause a finding other than that previously effected. .
. In closing may I state that I was deeply impressed by your presentation and persuasive advocacy on behalf of your brother’s case, during my visit with you in New York and in view of the grave affliction from which Dr. Lipp suffers. I felt it necessary to direct an exhaustive review of all facets of the case. However much one’s sympathies must lie with a victim of this dread disease, the compelling preponderance of medical evidence and professional opinion has constrained me to come to the above decision.
31. (a) On February 14, 1958, the Executive Secretary of the Army Board for Correction of Military Records addressed the following communication to the Surgeon General’s Office, Physical Standards Division:
L Reference is made to application filed by Frank E. Lipp wherein he requests that his military records be corrected to show him relieved from active duty on 26 January 1946 by reason of physical disability due to multiple sclerosis.
2. Prior opinions of your office, identified in the attached 201 File under tabs J, K, L and N, have been considered.
3. The case was presented to this Board on 26 October 1955 resulting in a determination to deny the application.
4. In July 1957 the applicant submitted additional evidence for purpose of obtaining reconsideration of his case. On 23 January 1958 the applicant’s brother, Attorney Louis E. Lipp, submitted further written argument relative to the contentions of the applicant.
5. It is requested that your office again review the evidence of record to include the material submitted *386 since the bearing before this Board and also the data contained in tbe applicant’s YA Claims Folder, which, is currently in the custody of the YA Central Office. It is desired that this Board be furnished an opinion as to whether the added evidence and argument affect the prior determination of your office that the condition of multiple sclerosis was not incapacitating at time of applicant’s relief from active duty.
6. It is further requested that the Board be informed as to whether the opinion of the Surgeon General’s Office that the presence of multiple sclerosis is not in itself incapacitating for active service, was a matter of professional opinion or whether this position was supported by regulation policy or other written authority.
7. In the event that your office adheres in the prior opinions rendered, it is requested that this Board be furnished with a detailed explanation upon which to base rebuttal to the specific points raised by Attorney Lipp in his letter to the Board, dated 23 January 1958.
(b) On February 28,1958, the Office of the Chief, Physical Standards Division, Office of the Surgeon General, advised the Army Correction Board as follows:
1. itecords in the case of Frank E. Lip¡p, 0321285, including the YA claims folder have again been reviewed in this office jointly with:
The Deputy Surgeon General
The Chief, Professional Division, OTSG
The 'Chief, Neurology and psychiatry consultant, OTSG
The Chief, Physical Standards Division, OTSG
2. The opinion of this office previously expressed on 3 June 1955 is jointly and unanimously reaffirmed that Lt. Colonel Lipp presented symptoms of multiple sclerosis prior to entry on active duty, that the condition was not aggravated by Military service and that he was not eligible for disability retirement benefits at the time of his separation in 1946.
3. Careful review of the records in arriving at this decision points up the decisive importance of the evidence provided by Dr. Walter Abbott m January 1941 and is succintly [sic] summarized in para. 4 of comment #2 this office dated 3 June 1955.
a. If Dr. Abbott’s report is to be accepted in its entirety, the evidence is clear that premonitory symptoms of multiple sclerosis existed in 1940.
*387 b. If tbe evidence provided by that report is to be ignored entirely, there is no recorded evidence that the disease manifested itself during service.
c. If, as recent evidence provided by Dr. Lipp suggests, Dr. Abbott was only partially correct and that the 1940 episode should be ignored but the 1941 event be accepted as significant, the fact that the latter episode occurred 1 month following entry into active service must be considered. The inference that the physiologic responses and pathologic changes precipitating such symptoms developed during this short period as a result of the rigors of military service would be difficult to substantiate on the basis of established medical principles.
4. The testimonial-type letters and statements of physician-friends presented by Dr. Lipp as new evidence attesting to the absence of significant symptoms prior to service do not contribute materially as evidence. In this connection, as pointed out by Wechsler in his Textbook of Clinical Neurology, the occurrence of fleeting mild neurological signs occurring months or years prior to actual onset of the disease and which are frequently overlooked or are considered of no significance is characteristic of this disease.
5. Since the condition under consideration is considered to be EPTS, the question of service aggravation must be recognized. In view of the absence of recorded evidence while in service of significant symptoms subsequent to the January 1941 episode, the negative findings at separation and nature of the progression of the disease following separation, there womd appear to have been no aggravation of the illness while in service. In this connection, review of the findings of the VA subsequent to separation would tend to confirm this opinion.
6. In compliance with paragraph 7 of comment #1, 11 February 1958, the specific points raised by Attorney Lipp are discussed below.
a. Attorney Lipp’s para. 1.
(1) While it appears to have been established in retrospect that early, premonitory signs of multiple sclerosis existed prior to and during service, the fact of the existence of clinical multiple sclerosis was not established at that time and, in fact, the diagnosis was not made until 1948. There would appear, therefore, to have been no error or injustice in the type of discharge received by Dr. Lipp in 1946. Under the existing circumstances, no other type of discharge would have been warranted by the available facts.
*388 (2) Dr. Lipp was not disqualified for retention in the service by any known regulation at tbe time of his separation. No retention standards were established by Regulation in 1946; members who were considered to be incapacitated for further service under induction standards were presented to an Army Retiring Board, whose findings were reviewed 'by the Surgeon General. The final decision rested upon the individual’s actual ability to perform the duties of his position. Dr. Lipp was not in fact incapacitated in any respect at separation.
b. Mr. Lipp’s para. 2.
While the presumption of soundness upon entry is established by Regulation, it is not believed that it is the intent of such Regulation to consider such presumption irrefutable or to ignore points of history or evidence of previous illness which were not available to the initial examiner but which come to light at a later date and are considered to be significant on the basis of established medical principles.
o. Mr. Lipp’s discussion of Dr. Abbott’s report.
No detailed comment in regard to this discussion is considered necessary since it simply attempts to completely discredit the unfavorable aspects yet entirely accept the favorable points of the same medical report. In connection with Mr. Lipp’s dismissal of the significance of history in his discussion however, it is pointed out that at the earliest stages of development of this disease, history is the most important, often the only means of providing a lead toward recognition of the 'basic pathology involved. Further, it is noted that the definitive diagnosis of multiple sclerosis in 1948 was admittedly, even at that relatively late date, made chiefly on the basis of history. Dr. Abbott could only have been a dispassionate, objective observer. He could Only have obtained and recorded the history from the patient himself who, being a physician, could describe these matters accurately; the symptoms he describes are typical of the premonitory symptomology of multiple sclerosis.
(c) Plaintiff’s request for reconsideration of his application for correction of military records (findings 30 and 31) was denied April 9,1958, on the stated ground that plaintiff had incurred multiple sclerosis prior to his entry on extended active duty, that his condition had not been aggravated 'by his .military service, and that “he was not eligible for dis *389 ability retirement benefits at tbe time of bis separation in 1946.”
32. (a) Army Regulation 605-10, approved May 26, 1944, and in effect unchanged on January 26, 1946, applicable to commissioned officers in the Army of the United States, provides, in section IV, paragraph 20, of the Physical Standards and Physical Examination portion, that the physical standards for appointment, promotion, entry on active duty, and retention of commission in the Army of the United States are those prescribed for the Officers Reserve Corps in AR 40-100 and AR 40-105.
(b) AR 40-105, approved October 14, 1942, and in effect unchanged in pertinent part on January 26, 1946, relates to the standards of physical fitness for a commission in the Regular Army or in the Army of the United States and, in paragraph 52e of section XVIII, which covers Nervous and Mental Disorders, lists multiple sclerosis as a cause for rejection without any qualification whatsoever.
(c) Paragraph 50 of section XVIII, AR 40-105, captioned “General Considerations,” states that “For the safety, efficiency, and economy of the military service it is highly essential that individuals with nervous and mental diseases be excluded. Diseases of this type may, and frequently do, exist in persons who are strong, active, and apparently healthy and who volunteer no complaints. Such individuals are, however, not dependable and cannot be relied upon * *
33. (a) AR 40-1025[9] applies to records and reports of sick and wounded. The stated purpose of such records is to furnish complete personal and diagnostic information on each individual patient. According to the regulation, such information is necessary (among other reasons) in order that data may be available for the conduct of the business of the War Department with particular reference to the retention of the physically fit in service, assignments to duty, adjustments of pay accounts, and the adjudication of claims for compensation or pension. “Army patients” as used in the regulation is defined to include Army personnel under medical treatment or observation, whether in Army or in non- *390 Army medical installations, and “Army personnel” is defined as including retired officers.
(b) Paragraph 63 of AN 40-1025, which relates to the standards for determining, for the purpose of the records provided for in the regulation, whether a disease was incurred in line of duty, includes, in subparagraph g, the following provisions:

g. Existed prior to individual's cwrrent active service and was not aggravated by service (EPTS).

*****
(2) Basic provisions. — Irrespective of length of service, an Army patient will be presumed to. have been in sound condition upon entering active service, unless the disease or injury, or the conditions which brought about the disease, injury, or death, were noted on the patient’s physical examination upon entrance into the service, or unless clear and unmistakable evidence ((3) below.) demonstrates that the injury or disease, or the conditions which caused the disease, injury, or death, though not noted, existed prior to the patient’s active service. Further, even if the existence of the condition prior to entering active service has been established, only specific findings of “natural progress” of the disease or injury, based on well-established medical principles, are able to overcome the presumption of service-aggravated ((4) below). This provision will serve as a basis for judging line of duty in all cases, on or after 7 December 1941, and before the termination of hostilities incident to the present war. (It will be borne in mind that in determining, line of duty with respect to eligibility for retirement benefits, the incapacity, whether resulting from a condition incident to service, or from a condition that existed prior to service but aggravated by the service beyond the “natural progress” of the condition, must be permanent; that is, the incapacity caused by the condition must be such that the removal of the disability within a reasonable time is highly improbable; see AN 605-250 and AN 615-395.)
(3) Olear and unmistakable evidence. — Medical judgment alone, as distinguished from well-established medical principles, will not be considered sufficient to rebut the presumption of the patient’s sound condition at the time of his entrance into active military service. Discovery of residual conditions, however, such as scars, healed fractures, absent or resected parts of organs, supernumerary parts, congenital malformations, or *391 fibrosis evidencing formerly active tuberculosis, is convincing enough to impel the conclusion that these conditions existed prior to the patient’s entrance into active service, without further proof, provided there is no evidence of active injury or disease during service. Manifestation of lesions or symptoms of chronic disease,_ so close to the date of the patient’s entrance into active service, that the disease could not have originated in so short a period, will be accepted as clear and unmistakable evidence that the disease existed prior to active service. Likewise, manifestation of disease within less than the required minimum incubation period, since the patient’s entrance into active service, will be accepted as evidence of inception prior to service.
(4) Service-aggravated. — Any increase in disability during active service resulting from a condition that existed prior to active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the bases of well-established medical principles. Medical or surgical treatment furnished during service for preexisting conditions does not of itself establish increase in disability; however, if such treatment was necessitated by increase in severity of preexisting conditions, then such disability will be considered as service-aggravated, unless the condition was improved by such treatment. Discovered healed residuals of a former injury or disease, without evidence of active pathology during service, will not be regarded as increase in disability. Similarly, mere recurrences of certain diseases within a short period after the patient’s entrance into active service, such as epileptic seizures, seasonal asthma, recurrent dislocations, etc., do not establish increase in the degree of disability. Also, incapacitating defects due to certain diseases, such as neoplasms, most endocrine disturbances (except hyperthyroidism or diabetes mellitus), epilepsy, arteriosclerosis, and hypertrophic (degenerative) arthritis, commonly designated as osteoarthritis, and other chronic and degenerative diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of preexisting conditions, and not incident to or aggravated by service. On the other hand, advancement of such conditions as peptic ulcer, rheumatoid arthritis, diabetes mellitus, active pulmonary tuberculosis, and bronchial *392 asthma (not established as seasonal) can be expected to have been caused by exertion, exposure, or other adverse influence of the military service. Acute infections such as pneumonia, active rheumatic fever (even though recurrent), acute pleurisy, acute ear disease, and sudden developments, as hemoptysis, lung collapse, perforating ulcer, decompensating heart disease, coronary occlusion or thrombosis, cerebral hemorrhage, occurring while in service, will be regarded as service-incurred or service-aggravated, unless it can be clearly and unmistakably shown that there was no increase in severity during active service.
34. Technical Manual 12-245, War Department, October 1, 1945, in effect on January 26, 1946, applies to the classification for disposition (including determination of eligibility for retirement benefits) of officers determined to be physically unfit for general or limited service. It provides in paragraph 60 (f), item 28. (3) :
A disease, injury or infirmity which results in a permanent incapacity for active service, as defined in paragraph 60a, and which the retiring board finds to have existed prior to entry on active duty, will be presumed to have been permanently aggravated by military service unless it is established beyond a reasonable doubt that no such permanent aggravation occurred.
35. A summing up of the record in this case discloses multiple sclerosis as an incurable disease, liable to a great variety of diverse manifestations, especially in its early stages, and eventually fatal unless anticipated by some other fatal event before it has run its course.
Its cause is not known. It has no recognized period of latent incubation. Its onset is generally regarded as simultaneous with the appearance of the first physical symptoms. These are varied, and in themselves subtly ambiguous and inconclusive. More frequently than not they will sustain or assist a diagnosis of multiple sclerosis only when coupled with a subsequent medical history wherein a cumulation of later manifestations lends character, retroactively, to early symptoms which might be attributable to other causes in the absence of the later, more conclusive evidence, and some of which, if the truth could be discovered, might properly *393 be attributable to other causes even though multiple sclerosis becomes clearly evident at a later time.
The course of the disease is highly variable. Infrequently it progresses rapidly. More commonly its advance is slow and intermittent, characterized by a sudden onset of symptoms which may persist or may diminish or disappear through periods of spontaneous remission that may last for years, leaving the patient in some cases with no current physical evidence that he has the disease, except possibly small scars on the sheaths of the affected nerves that could be observed only by autopsy.
Eventually the damage caused by recurrent attacks and consequent scarring, and by broadening of the areas affected, cumulates to a point where impairment of physical and mental functioning is crippling in ways that vary with the intensity of the damage done and the location and scope of the areas served by the nerves that have been affected.
36. There is wide agreement among experts that paraesthe-sias of all kinds, such as tingling, pricking, coldness, burning, numbness, deadness, and like sensations in the face, trunk, or limbs seldom fail to appear at some point in the course of the disease and may be the first symptoms to excite attention.
There is evidence that paraesthesias of the face, if followed, over a period of years, by other symptoms that support an ultimate diagnosis of multiple sclerosis, might mark the onset of the disease, but the record reflects a sharp conflict of respectable opinion as to the frequency of this symptom as an initial manifestation.
One generally recognized authority says that paraesthesias confined to the field of the fifth nerve (which supplies the face and a rather substantial area of the side of the head extending behind the ear and above the normal hairline) occur with no little frequency, sometimes as the first symptom, whereas one of the expert witnesses, who testified that he had observed between one thousand and two thousand cases in recent years, said that he had never observed this particular symptom and that in his opinion it was uncommon at any stage of the disease.
It appears that a pricking sensation covering the entire area supplied by the fifth nerve should be regarded as more *394 likely to be indicative of the onset of multiple sclerosis, if subsequently confirmed by other manifestations, than a mere transitory localized tingling of the face within the field of the fifth nerve but not covering the entire area supplied by that nerve.
There is also testimony of a recognized expert that transitory paraesthesias covering the whole area of the fifth nerve, that occurred years before there was enough evidence to support a firm diagnosis of multiple sclerosis, could be attributable properly to no other cause than the initial onset of the multiple sclerosis unless it were shown that some other specific cause, such as local anesthesia, a trauma,' a serious sinus infection, a brain tumor, or some other substantial influence affecting the fifth nerve, was the specific cause of that particular early paraesthesia. Taking into account tire whole of the evidence in this record, this analysis gives the impression of a retrospective diagnostic rule of thumb, doubtless useful in medical practice, but scarcely rising to the character of an immutable medical principle.
Indeed, it is impossible to find, from the variety of opinions concerning the onset of multiple sclerosis that are expressed in this record, any statement pertinent to the identification of the time of onset that is so positive and so widely accepted as to justify characterization as an accepted medical principle.
There is, moreover, credible evidence in the record, not only that fatigue, nervous exhaustion, tension, or worry can cause tingling sensations or numbness in the face, but that anxiety, self-concern, and worry are the most common causes of localized paraesthesias of the face. Dr. Abbott and Dr. Ely, neurologists who examined the plaintiff in January 1941 when he had facial paraesthesias coupled with other symptoms, and to one of whom, at least, he reported the facial paraesthesias, on the left side of the face that he had experienced in June of 1940, attributed his troubles variously to anxiety and exposure to draft (in the case of Dr. Ely) and to fatigue (in the case of Dr. Abbott). None of the experts who testified criticized these diagnoses as made on the basis of the evidence available at the time they were made.
*395 37. The conclusion seems clear from the whole of the evidence here that one who feels a transitory pricking or tingling of the face as the plaintiff did in June of 1940, may sense the onset of multiple sclerosis, or (passing over other possible causes that are unlikely in this case) may be merely extremely tired or worried to the point of nervous exhaustion. It is equally clear, even in the case of a person who, like the plaintiff, subsequently is found to have multiple sclerosis, that initial, transitory paraesthesias might be indicative of the onset of the multiple sclerosis, or might be separately caused by fatigue, tension, or worry, or by some other cause that occurred before the first inflammation of the nerves that marked the physical beginning of multiple sclerosis. There is no basis in common experience for assuming that a man who develops multiple sclerosis was never tired out or deeply worried before the disease first struck him. Such a man could, before the actual onset of multiple sclerosis, have paraesthesias of the face that had no connection whatever with that disease.
38. For the reasons stated in findings 35, 36, and 37, I conclude that while the evidence here by no means dispels the possibility, or even a reasonable probability, that the plaintiff had multiple sclerosis in June of 1940, no established medical principle has been shown that compels the conclusion that he did. Nor does the record contain clear and unmistakable evidence that demonstrates beyond a reasonable doubt that he had multiple sclerosis before he entered on active duty in December 1940. The possibility that the paraesthesias of the face in June 1940 derived from causes other than multiple sclerosis is plainly present on this record.
39. On the basis of the facts here found, a determination whether the administrative decisions made in this case, that plaintiff is to be regarded as having had multiple sclerosis before he entered on active duty, were arbitrary, capricious, or contrary to law, depends upon the legal effect and applicability of standards and presumptions stated in the regulations and cannot be made solely as a finding of fact.
40. The evidence with regard to factors, if there are any, that may aggravate existing but abeyant multiple sclerosis *396 is about as varied and conflicting as that relating to the onset of the disease and, if anything, is more tentative.
The aggregate impression that emanates from the diversity of views expressed in the record is that no one knows, for certain, whether environmental factors affect the course of the disease.
One recognized authority states that the attacks occur spontaneously and are not definitely related to any known environmental factor.
More recently published authorities express a belief, but no positive conviction, that infections, chilling, fatigue, and emotional upsets may precipitate attacks.
There is evidence that current medical thinking suggests, among precautions to be urged upon multiple sclerosis patients in an effort to prevent recurrences, such things as avoidance of fatigue, avoidance of stress, avoidance of emotional events, and the maintenance of good nutrition and good general bodily health, with the greatest emphasis on avoidance of physical and emotional stress.
Another recent, recognized authority states that “Fatigue has always been regarded as a precipitating or aggravating factor in multiple sclerosis.”
Febrile illnesses, lowered general health, trauma — slight or severe—allergic disorders, and chills or sudden lowering of body temperature, are listed in a recent, professionally recognized publication, among events said to be justifiably regarded as factors precipitating relapses.
Generally, however, even among those who consider these divers physical or emotional discomforts to be possible aggra-vators of multiple sclerosis, they are regarded as effective causes of relapses only when a relapse occurs a relatively short time —1 or 2 months or less—after the putative cause.
Such evidence as there is in this record does not support a general conclusion that the emotional and physical stresses of war service aggravate multiple sclerosis. On the other hand, there is no direct proof that they might not, in individual cases.
In summary, it is impossible to find, among the cautious, conflicting, tentative statements of the authorities, any established principle that would sustain a generalized deter *397 mination whether environmental factors do or do not aggravate multiple sclerosis. There is no clear or unmistakable evidence that they do or that they do not. There is ample proof that no one really knows.
41. Whatever may be the overall statistical truth about the effect of the rigors of active military service on victims of multiple sclerosis as a class, there is no clear or unmistakable evidence that the plaintiff’s case was aggravated by the hazards, discomforts, and physical and emotional stresses he endured in the course of his extended period of active duty. After the episode that began in January 1941, he had no clearly identified evidence of multiple sclerosis until 1946, after his active service had ended. There is no way to tell whether the recurrent fatigue, unsteadiness, and fibrillary twitchings he experienced but disregarded while he was overseas were attributable to multiple sclerosis or were merely direct results of overwork and nervous tension. Moreover, the evidence provides no basis for a judgment whether, if they were related to multiple sclerosis, they were brought on by the rigorous conditions in which he lived and worked, or would have occurred in any environment, as mild exacerba-tions, normal to the course of the disease.
The fact is that the plaintiff continued, throughout a long period of service under difficult conditions, to perform his military responsibilities with physical competence adequate to their efficient fulfillment, and no evidence of disability was found when his active service came to an end in January of 1946.
42. On the basis of the facts here found, a determination whether the succession of administrative decisions made in this case,
(a) that plaintiff is to be regarded as not having-been disabled by multiple sclerosis, plainly present but in remission, when his active service ended in January 1946, and
(b) that the disease is to be regarded as not having-been aggravated by the conditions under which he served,
were arbitrary, capricious, or contrary to law, depends on the legal effect and applicability of standards and presump *398 tions stated in the regulations and cannot be made solely as a finding of fact.
43. (a) On August 22, 1958, plaintiff filed suit in this court (Docket No. 384-58) to recover the disability retirement pay of a lieutenant colonel with over 10 years’ service from and after January 27,1946. The case was tried before the late Trial Commissioner Robert K. McConnaughey on July 29 and 30,1959, November 19, 1959, and April 25,1960. On February 8,1961, Commissioner McConnaughey filed with the court a detailed report of his findings of fact. On April 4,1962, the court, “having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the briefs and argument of counsel” (Lipp v. United States, 157 Ct. Cl. 197, 202), made findings of fact identical with those set forth in the commissioner’s report, but dismissed plaintiff’s petition on the ground that the “instant cause of action is * * * barred by the statute of limitations.” Plaintiff’s petition for a writ of certiorari was denied by the United States Supreme Court May 27, 1963 (373 U.S. 932 (1963)).
(b) By letter dated July 29, 1963, plaintiff filed with the Army Board for Correction of Military Eecords an application for reconsideration of his March 15, 1954, application for correction of military record. In the application for reconsideration, plaintiff asked correction of his military record “to reflect my retirement for physical disability as of 26 January 1946” on the ground that, in light of the findings of fact of the court in Lipp v. United States, supra, the relief sought should be granted.[10] In his brief in support of his application for reconsideration, plaintiff recited, inter alia, (i) that he was “plainly” suffering from multiple sclerosis at the time of his relief from active duty; (ii) that under the laws, rules, regulations, and policies in effect on January 26, 1946, multiple sclerosis rendered an officer permanently unfit for active military service (Patterson v. United States, supra, 141 Ct. Cl. at 446-50, and 452-53; Proper v. United States, 139 Ct. Cl. 511, 517, 154 F. Supp. 317 (1957)); (iii) that the applicable Army regulations creating the presumption of sound physical condition upon entry on extended active duty absent clear *399 a.Tifl -unmistakable evidence establishing, beyond a reasonable doubt, that a condition discovered during service, but not “noted on the patient’s physical examination upon entrance into the service,” existed prior to the patient’s active service; and (iv) that the court’s findings of fact, including, specifically, that “no established medical principle has been shown that compels the conclusion that” plaintiff had multiple sclerosis in June of 1940; nor was there “clear and unmistakable evidence that demonstrates beyond a reasonable doubt that he had multiple sclerosis before he entered on active duty in December 1940.” Plaintiff asserted, in light of the foregoing, that the administrative decisions in his case “that the applicant had multiple sclerosis prior to entry on active duty and that the condition was not aggravated by military service” were, in substance, clearly violative of plaintiff’s rights as a matter of law.
(c) On October 4, 1963, the Executive Secretary, Army Board for Correction of Military Records, addressed the following letter to counsel for plaintiff:
Reference is made to your letter of 29 July 1963 wherein you request reconsideration in the case of Frank E. Lipp, 0321285.
Army Regulations 15-185, which govern the procedures of this Board, provide, in pertinent part, that after final adjudication, further hearing will be granted only upon presentation of newly discovered relevant evidence not previously considered by the Board and then only upon recommendation of the Board and with the approval thereof by the Secretary of the Army.
The pertinent military records together with the brief and exhibits submitted by you have been reviewed and it has been determined that the material submitted in support of a request for rehearing fails to meet the criteria established, referred to in the preceding paragraph.
In. consideration of the foregoing, no further action relative to reconsideration is contemplated based upon the instant request and material submitted in support thereof.
44. (a) The administrative decisions made in this case, that plaintiff had multiple sclerosis before he entered on active duty on December 9, 1940, are contrary to law, in that the decisions failed to give adequate scope as a matter of law to *400 valid Army regulations creating a presumption of service in-currence favoring plaintiff and establishing requirements upon administrative channels in applying and rebutting that presumption, and deprived plaintiff of substantial rights thereunder.
(b) Assuming that plaintiff could lawfully be regarded as having had multiple sclerosis prior to December 9, 1940, the succession of administrative decisions made in this case, that plaintiff’s multiple sclerosis was not aggravated by the conditions under which he served, would be contrary to law, in that the decisions failed to give adequate scope as a matter of law to valid Army regulations creating a presumption of service aggravation of preexisting disease favoring plaintiff and establishing requirements upon administrative channels in applying and rebutting that presumption, and deprived plaintiff of substantial rights thereunder.
CONCLUSION OF Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment is entered to that effect. The amount of the recovery will be determined in further proceedings pursuant to Eule 47(c) (2).
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on December 22, 1967, that judgment for the plaintiff be entered for $40,121.98.

The opinion, findings of fact, and recommended conclusion of law are submitted under the order oí reference and Rule 57 (a).

 Finding 1(e).

 Plaintiff entered the service on December 9, 1940. The symptoms appeared on January 10, 1941.
There was also in plaintiff’s medical history a report of facial paraesthesias in June 1940 (before he entered service) on the basis of which some medical opinion and all of the administrative decisions assign the onset of the disease to that date. Medical opinion generally ascribes the onset of the disease to the first appearance of definitely recognized symptoms.

 See particularly the letter addressed to plaintiff’s brother by the Assistant Secretary of the Army, reported In finding 30.

Findings 32-33.

 In the administrative proceedings, reference was made obliquely (finding 33(b)g(3)) to the further qualification of the presumption of sound condition that “manifestation of * * * symptoms of chronic disease, so close to the date of * * * entrance Into active service, that the disease could not have originated in so short a period, will be accepted as clear and unmistakable evidence that the disease existed prior to active service.” Plaintiff entered the service on December 9, 1940. The symptoms to which the onset of the disease is now ascribed appeared on January 10, 1941. The medical testimony does not, however, relate multiple sclerosis to the “chronic disease” category mentioned In the regulation.

 Cf. Reece v. United States, 180 Ct. Cl. 932 (1967).

 Frederick v. United States, 150 Ct. Cl. 769, 772, 280 F. 2d 844, 845 (1960).

 By reason of the Private Law under which the present action was brought, we are not now concerned with the question of the time bar as discussed in either the majority opinion (by Judge Madden) in Patterson, or the continuing claim element which was the basis of Chief Judge Jones’ partial dissent.

 The similar fact in the case of the instant plaintiff (that he was not physically incapacitated at the time of his release from active duty to a degree sufficient to warrant his retirement for physical disability) has been a major sticking point in the administrative consideration of his claim.

 141 Ct. Cl. at 448.

 Id. at 447.

 Judge Whitaker, dissenting in Patterson, found it “* * * hard * * * to understand how 'these doctors could have told that the disease from which plaintiff was suffering had had its inception 8 years before.” 141 Ct. Cl. 435, 455. Patterson was before the court on cross-motions for summary judgment. There was no such medical evidence before the court in that ease as was received and considered in the instant ease. Reference has already been made to the unanimity of medical opinion in relating the onset of multiple sclerosis to the appearance of symptoms not fully evaluated at the time.

 Plaintiff is a citizen of the United States, born March 11, 1910, in Omaha, Nebraska. He was married July 8, 1938, and has two children, a son born May 30, 1940, and a daughter born in 1948. In November 1965, he was placed in Haven House, an approved nursing facility in Omaha, Nebraska, because of long-standing multiple sclerosis which, by the time this action was commenced, had reached a stage of marked severity; plaintiff has no use of his right lower extremity, his equilibrium is greatly impaired, his memory and orientation are disrupted, and he is nonambulatory and should not be left alone.

 The trial of this case has been limited to the issues of law and fact relating to the right of plaintiff to recover, with the determination of the amount of his recovery, if any, reserved for further proceedings.

 In the same report to the Veterans Administration, it was noted that plaintiff had had “recurrence of numbness in New Guinea 1943 and 1944.” As with his fatigue, unsteadiness, and fibrillary twitching (finding 9), however, this was not oflicially reported at the time.

 The December 10, 1940, physical examination was not at Omaha, Nebraska, as Dr. Abbott stated, but at Fort Des Moines, Iowa.

 Dr. Abbott’s letter of October 1, 1953, Quoted hereafter in finding 27(a) says — “however, you did not notice any spasm of the right facial muscles until a week prior to the time you were referred to me.”

 The “entire distribution of the right trigeminal nerve” would encompass a very considerable area of the face and scalp.

 At the time the Veterans Administration held that plaintiff’s multiple sclerosis was service-incurred, the affidavit of Dr. Abbott quoted in finding 19 had been “received” and “noted.” The VA Schedule for Rating Disabilities (1945 ed.), as amended, then provided a “minimum rating” of 30 percent, under VA Code No. 8018, for multiple sclerosis. See also Patterson v. United States, 141 Ct. Cl. at 445, 448-49 (1958).

 The 30-percent rating obtained through November 19, 1956. On November 20, 1956, the percentage of disability was increased to 60 percent, which obtained until February 11, 1959. On February 12, 1959, it was increased to 100 percent.

 Approved December 12, 1944, and in effect unchanged in pertinent part on January 26, 1946.

 Trial Commissioner McConnaughey’s report, the trial transcript of testimony, and the opinion of the court were attached to the request for reconsideration, as was plaintiff’s brief.